Argued and submitted May 29, affirmed on appeal and cross-appeal July 15, petition for review denied November 24, 1998 (328 Or 40)

# STATE OF OREGON,
*Respondent - Cross-Appellant,*

*v.*

# LOYD EDGAR HAYS,
*Appellant - Cross-Respondent.*

(95030713A; CA A93814 (Control), A93844)
(Cases Consolidated)

964 P2d 1042

Peter Gartlan, Deputy Public Defender, argued the cause for appellant - cross-respondent. With him on the briefs was Sally L. Avera, Public Defender.

Richard D. Wasserman, Assistant Attorney General, argued the cause for respondent - cross-appellant. With him on the brief were Hardy Myers, Attorney General, and Virginia L. Linder, Solicitor General.

Before Warren, Presiding Judge, and Edmonds and Armstrong, Judges.

WARREN, P. J.

**WARREN, P. J.**

Defendant appeals his conviction for criminally negligent homicide, based on his failure to seek medical treatment for his son, who died of acute leukemia. In accordance with his religious faith, defendant treated his son solely by prayer and the laying on of hands. The court sentenced him to five years' probation, with special conditions that he report to his probation officer if any child in his custody suffers from a life-threatening disease or other physical condition and that he then permit examination of the child and removal for medical treatment. The state cross-appeals the sentence, asserting that the trial court improperly made a downward departure from the guidelines sentence of 16 to 18 months' incarceration. We affirm on the appeal and the cross-appeal.

Defendant is a member of the Church of the First Born, a small Pentecostal denomination that has approximately 12,000 to 15,000 members throughout the country. An essential tenet of the denomination is that God is operational in the life of each believer, including when he or she is sick. According to church doctrine, if members pray for one who is ill, God will honor those prayers and restore the member to health. The church permits the use of purely corrective devices, such as eyeglasses or crutches, and it allows its members to undergo medical examinations when required. It does not, however, allow medical treatment.

Defendant is a long-time member of the church and is one of the three elders of the congregation in Brownsville, where he lives. He has never in his life taken a pill or received an injection, although at times he has suffered excruciating pain. At one point the pain so interfered with his work as a roofer that the Vocational Rehabilitation Department referred him to a physician for an examination. The physician diagnosed kidney stones and a number of related problems, including that defendant has only one functioning kidney, and advised him that failure to allow medical treatment could lead to kidney failure and death. Despite that warning, defendant did not seek treatment.

Defendant's eight-year-old son, Anthony, became ill in October 1994, while he was returning with the family from

an outing to Oklahoma. As a result of the sickness, they returned to Oregon sooner than they originally intended. After a temporary improvement in his condition on his return, Anthony's condition became considerably worse. At the child's request, defendant and the other elders of the church prayed over him. By the end of October, defendant suspected, based on his reading of medical literature, that Anthony was suffering from leukemia. The evening of November 3, a deputy sheriff came to check on a report that Anthony might be sick. Defendant told the sheriff that Anthony was sick but refused to allow him to see the child. The next morning the elders again prayed over Anthony, who died in defendant's arms soon afterwards. According to the record, leukemia in children is readily treatable, with a 98 percent chance of remission after a month of treatment and a 70 to 85 percent chance of survival for at least a significant number of years. There is no chance of survival for untreated leukemia; death from the disease involves severe pain.

Defendant and his wife were subsequently indicted for manslaughter in the first degree, manslaughter in the second degree, and criminally negligent homicide. The jury acquitted defendant of manslaughter but convicted him of criminally negligent homicide; it acquitted his wife of all counts. The issue that underlies all of defendant's arguments on appeal is the relationship between his religious faith and the requirements of the applicable statutes.

Defendant first argues that the statutory definition of criminally negligent homicide is unconstitutionally vague. *See State v. Cornell/Pinnell*, 304 Or 27, 29-30, 741 P2d 501 (1987). ORS 163.145 provides that a person commits criminally negligent homicide when the person causes the death of another person "with criminal negligence." ORS 161.085(10) defines "criminal negligence" to mean that

> "a person fails to be aware of a substantial and unjustifiable risk that the result will occur or that the circumstances exists. The risk must be of such nature and degree that the failure to be aware of it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation."

The indictment charged that defendant committed the offense by withholding necessary medical care from Anthony when, as his parent, defendant had a duty to provide that care for him.

Defendant points out that the criminal mistreatment statutes also penalize failing to provide or withholding necessary medical attention when there is a legal duty to provide it, but that they provide a defense for treatment by spiritual means. Under ORS 163.200(1)(a), it is criminal mistreatment in the second degree to withhold medical treatment with criminal negligence; under ORS 163.205-(1)(a) it is criminal mistreatment in the first degree to do so intentionally or knowingly. The basis of defendant's argument is that the defense for treatment by spiritual means does not apply to ORS 163.145. As a result, defendant asserts, a person cannot know when conduct that the criminal mistreatment statutes permit has crossed over into conduct that the criminally negligent homicide statute forbids.

ORS 163.206(4) provides that ORS 163.200 and ORS 163.205 do not apply:

> "To a person who provides [a] * * * dependent person with spiritual treatment through prayer from a duly accredited practitioner of spiritual treatment as provided in ORS 124.095, in lieu of medical treatment, in accordance with the tenets of a recognized church or religious denomination of which the * * * parent or guardian of the dependent person is a member or an adherent[.]"

A person who treats a dependent child through prayer, thus, has a defense to a charge of criminal mistreatment, a defense that does not apply to a charge of criminally negligent homicide.[1] Thus, so long as the child does not die, the parent has a defense to a criminal charge; once the child dies, the defense is gone. As a result, it is impossible, defendant argues, to tell at any particular moment whether his conduct was permissible or criminal. He asks whether his failure to provide medical care for Anthony was criminal

---

[1] ORS 163.115(4), adopted in 1995, now provides a similar defense to a charge of murder by abuse when the charge is based on withholding necessary medical treatment. Treatment by prayer or other spiritual means continues not to be a defense to manslaughter or criminally negligent homicide.

"when the family traveled to Oklahoma? in Oklahoma? on the return from Oklahoma? while the victim was still alive in Oregon? ten minutes before the victim's death? or only at the time the victim died? How can a person of average intelligence possibly know when the exact conduct, which appears ostensibly privileged by statute, becomes criminal? How can different juries make that determination on a consistent basis?"

Defendant relies on *Minnesota v. McKown*, 475 NW2d 63 (Minn 1991), and *Hermanson v. Florida*, 604 So 2d 775 (Fla 1992), to support his position. In *McKown*, the Minnesota Supreme Court first held that a statutory defense similar to ORS 163.206(4) did not apply to a charge of manslaughter. It then determined that that failure violated the Due Process Clause of the Fourteenth Amendment because it failed to give adequate notice of when the protected conduct became criminal and because it first informed citizens that certain conduct was permissible and then prosecuted them for engaging in that very conduct. In *Hermanson*, the Florida Supreme Court adopted similar reasoning.[2]

■ We cannot agree with the Minnesota and Florida courts. We have previously held that "criminal negligence," when used to define a culpable mental state for the purposes of the child neglect statutes, is not unconstitutionally vague. *State v. Mills*, 52 Or App 777, 629 P2d 861, *rev den* 291 Or 662 (1981). We recognize that it may be impossible to define in advance all of the ways in which a person's actions can be a gross deviation from the standard of care of a reasonable person. That difficulty does not mean, however, that the legislature may not penalize such a gross deviation. Rather, the legislature responded to the inability to give an exhaustive list of impermissible conduct by adopting an objective standard—what a reasonable person would do—for evaluating what a person in fact did. 52 Or App at 781-84. Defendant was not required to guess what someone in the future might think would have been a better thing for him to do. He was

---

[2] Defendant recognizes that other jurisdictions have taken a contrary view. *See, e.g., Walker v. Superior Court*, 47 Cal 3d 112, 253 Cal Rptr 1, 763 P2d 852 (1988), *cert den* 491 US 905 (1989); *Hall v. State*, 493 NE2d 433 (Ind 1986); *Commonwealth v. Barnhart*, 345 Pa Super 10, 497 A2d 616 (1985), *cert den* 488 US 817 (1988).

held to a standard that derives from the community of which he was a part. The statute in itself gave sufficient guidance to defendant in determining what the law required, to a court in determining whether the evidence would permit a jury to find that he violated those requirements, and to a jury in making that finding.

Defendant's argument, however, goes one step further than we needed to go in *Mills*. He insists that the defense that ORS 163.206(4) provides to a charge of criminal mistreatment makes it impossible for him to tell when his permissible actions have crossed the line into the impermissible. The defense permits him to do things that would otherwise constitute criminal mistreatment, but it does not permit him to do things that would constitute criminally negligent homicide. Defendant's argument fails.

■ ORS 163.145 is not legally ambiguous when applied to a parent's duty to provide medical treatment to a child: if the parent's failure to be aware of a substantial risk that the child will die is a gross deviation from the standard of a reasonable person, and if as a result the child dies, the parent is guilty of the offense. That is, the statutes permit a parent to treat a child by prayer or other spiritual means so long as the illness is not life threatening. However, once a reasonable person should know that there is a substantial risk that the child will die without medical care, the parent must provide that care, or allow it to be provided, at the risk of criminal sanctions if the child does die. The statute is not vague.[3]

Defendant next argues that the Religious Freedom Restoration Act (RFRA), 42 USC §§ 2000bb to 2000bb-4, requires the state to show a compelling state interest in order to impose sanctions on him for following a precept of his religious faith. In the RFRA, Congress attempted to reinstate the test that existed before the United States Supreme Court's decision in *Employment Division v. Smith*, 494 US 872, 110 S

---

[3] Indeed, defendant's argument is available only because the legislature exempted treatment by spiritual means from the otherwise absolute requirement that a parent provide needed medical care to a child. The legislature's decision to exempt parents who do fail to provide medical care for religious reason from punishment for criminal mistreatment does not mean that it was also required to exempt those parents from punishment for criminally negligent homicide.

Ct 1595, 108 L Ed 2d 876 (1990), for determining when a governmental action violates the free exercise of religion that the First Amendment guarantees. Defendant recognizes that the Court recently held that the RFRA is unconstitutional, at least as applied to the states and their subdivisions, because it is a Congressional attempt to establish the contours of a constitutional right, something that is the province of the courts. *City of Boerne v. Flores*, 521 US 507, 117 S Ct 2157, 138 L Ed 2d 624 (1997). He argues, however, that the events in this case occurred before that decision and that it would be unconstitutional to apply *City of Boerne* retroactively.

■■ The difficulty with defendant's argument is that the Supreme Court has determined that the RFRA was *never* constitutional; that is, it was *never* the law. Even if he had been aware of the RFRA and had actually relied on it during Anthony's illness, two things that are questionable on this record, he cannot rely on it now. This is not a case like *Raley v. Ohio*, 360 US 423, 79 S Ct 1257, 3 L Ed 2d 1344 (1959), in which a governmental agency misled the defendants into believing that they had rights that they did not have and then prosecuted them for exercising those rights. Rather, the applicable rule in this case is the normal rule that, when the Supreme Court makes a controlling interpretation of federal law in a case properly before it, that rule must be given full retroactive effect in all cases that are open on direct review, no matter when the events involved may have occurred. *See Harper v. Virginia Dept. of Taxation*, 509 US 86, 97, 113 S Ct 2510, 125 L Ed 2d 74 (1993). The RFRA has no impact on this case.

Defendant's final argument is that a combination of the Due Process Clause of the Fourteenth Amendment and the Free Expression Clause of the First Amendment both requires the state to show a compelling state interest in order to impose sanctions on him for his conduct and requires it to use the least restrictive means available in doing so. Because Anthony is dead, he argues, there is no longer a compelling state interest and, even if there were, a *post hoc* criminal prosecution is not the least restrictive means of protecting that interest.

■ Even if we were to accept defendant's attempted combination of rights, it would give him no assistance. Protecting the lives and welfare of children is unquestionably a compelling state interest. *See, e.g., Ginsberg v. New York,* 390 US 629, 640-41, 88 S Ct 1274, 20 L Ed 2d 195 (1968). The state's interest does not end when a child dies; the state has an interest in protecting those children who are still alive. Imposing criminal sanctions on a person who is responsible for one child's death will further that interest by establishing that parents must comply with the law and by discouraging other parents from failing to provide medical care for children with life-threatening conditions. Defendant suggests that removing the child from the parent's home to provide needed treatment in time to save the child's life would be a preferable action. It would not, however, represent a lesser interference with a parent's religious freedom than a prosecution after the child's death. Once the child has died, a prosecution is the only way to vindicate the state's interest as to that child and to encourage compliance with the law as to other children.

We turn to the state's cross-appeal. The trial court, in making a downward departure and imposing probation rather than a prison term under the guidelines, found two mitigating factors, either one of which, it held, would justify the departure. The state on its cross-appeal attacks the factual and legal basis for each of those factors.

■ The first mitigating factor was that defendant cooperated with the police with respect to the crime of conviction. The state argues that there is no evidence to support the court's finding. It does not deny that defendant cooperated with the police after Anthony's death. Rather, it points to defendant's refusal to allow a deputy sheriff to see Anthony the night before he died, arguing that defendant thereby deprived Anthony of medical treatment that, even at that late hour, could have saved him. The difficulty with the state's argument is that, at the time that defendant refused to allow the sheriff to see Anthony, he had not committed the crime of negligent homicide. By its very nature this mitigating factor involves a defendant's cooperation *after* the commission of the crime. As defendant points out, the state is

attempting to use his inability to prove the defense of renunciation, ORS 161.430, which if applicable would have prevented a conviction, to restrict his ability to rely on a mitigating factor that might reduce his sentence after conviction. The trial court properly limited its attention to defendant's post-crime conduct in determining whether he had shown this factor.

■      The state does not deny that defendant cooperated with the police after Anthony's death. It argues, however, that he retains his religious convictions and, thus, does not show remorse for his actions. It points to nothing in the sentencing guidelines, their background, or any other source that suggests that remorse is an essential element of this mitigating factor. OAR 253-08-002(1)(a)(F) simply provided that it is a mitigating factor when the "offender cooperated with the state with respect to the current crime of conviction or any other criminal conduct by the offender or other person." There is evidence to support the trial court's conclusion that that factor applies in this case.[4]

■      The second mitigating factor on which the trial court relied was that defendant had lived conviction-free in the community for a substantial period of time before the crime of conviction. OAR 253-08-002(1)(a)(H). The state argues that defendant's placement at criminal history rank "I," the least serious rank, already captures that history. If so, this mitigating factor would give defendant double credit for his good record. The difficulty with the state's argument is that a person may have multiple juvenile adjudications for any misdemeanor and multiple adult convictions for Class B and Class C misdemeanors and still qualify for rank "I." Defendant, in contrast, has absolutely no previous arrests or convictions of any kind. The trial court expressly found that he is a person of good character, a finding that the state does not challenge. Defendant's criminal history is far superior to that of a petty shoplifter who has managed to keep his or her nose

---

[4] The mitigating factors that OAR 253-08-002 described are not exclusive; we do not foreclose the possibility that a court in a proper case could find that a defendant's remorse is a mitigating factor. We simply hold that it is not a necessary component of finding that defendant cooperated with the police.

just clean enough to qualify for rank "I." The trial court properly found that this mitigating factor applied.

Affirmed on appeal and cross-appeal.