# IN THE SUPREME COURT OF TENNESSEE
## AT KNOXVILLE
September 4, 2014 Session

## STATE OF TENNESSEE v. JACQUELINE CRANK

**Appeal by Permission from the Court of Criminal Appeals**
**Circuit Court for Loudon County**
**No. 10611B     E. Eugene Eblen, Judge**

---

## No. E2012-01189-SC-R11-CD - Filed February 13, 2015

---

The defendant, who was indicted for child neglect based upon her failure to obtain medical treatment for her daughter, challenged the constitutionality of the "spiritual treatment" exemption within the child abuse and neglect statute. The exemption, which is set out in Tennessee Code Annotated section 39-15-402(c), precludes the prosecution of parents who "provide[] treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof in lieu of medical or surgical treatment." The defendant moved to dismiss the charge against her, claiming that the exemption was unconstitutionally vague and violated the Establishment and Equal Protection Clauses of the Federal Constitution, as well as the comparable provisions of the Tennessee Constitution. The trial court denied the motion to dismiss. Following a bench trial, the trial court determined that the defendant did not qualify for the spiritual treatment exemption, found her guilty of child neglect, and imposed a sentence of eleven months and twenty-nine days, all to be served on unsupervised probation. The Court of Criminal Appeals affirmed the conviction without addressing the merits of the constitutional claims. We hold that the spiritual treatment exemption is not unconstitutionally vague. Because the exemption may be elided without invalidating the remainder of the child abuse and neglect statute, the defendant's remaining constitutional challenges, even if successful, would not afford her relief. As a result, we decline to address whether the exemption violates the Establishment or Equal Protection Clauses of the Federal Constitution or the corresponding provisions in article I, section 3 and article XI, section 8 of the Tennessee Constitution. The judgment of the Court of Criminal Appeals is affirmed.

### Tenn. R. App. P. 11 Appeal by Permission; Judgment of the Court of Criminal Appeals Affirmed

GARY R. WADE, J., delivered the opinion of the Court, in which SHARON G. LEE, C.J., and

CORNELIA A. CLARK and HOLLY KIRBY, JJ., joined. JEFFREY S. BIVINS, J., not participating.

Gregory P. Isaacs and Andrea B. Mohr, Knoxville, Tennessee, for the appellant, Jacqueline Crank.

Robert E. Cooper, Jr., Attorney General and Reporter; Joseph F. Whalen, Acting Solicitor General; John H. Bledsoe, Senior Counsel; Russell Johnson, District Attorney General; and Frank Harvey, Assistant District Attorney General, for the appellee, State of Tennessee.

Catherine E. Swan, Steamboat Springs, Colorado, and A. Wayne Henry, Loudon, Tennessee, for the amici curiae, Children's Healthcare Is a Legal Duty et al.

**OPINION**

**I. Facts and Procedural History**

In April of 2001, Ariel Ben Sherman rented a house in Lenoir City, where he began to conduct religious services in the name of the Universal Life Church. The parishioners of the church included Jacqueline Crank (the "Defendant") and her minor daughter, Jessica. Jessica became ill in early 2002 and was eventually diagnosed with Ewing's Sarcoma, a rare form of cancer that most commonly afflicts people under the age of twenty. She died in September of 2002 at the age of fifteen.

In April of 2003, Sherman and the Defendant were indicted for neglect of a child under the age of eighteen, see Tenn. Code Ann. § 39-15-401(a) (Supp. 2001), based upon their failure to obtain adequate medical treatment for Jessica. Although the trial court dismissed the indictment against Sherman, the charge was reinstated on appeal, and the case was remanded for further proceedings. State v. Sherman, 266 S.W.3d 395, 399 (Tenn. 2008). On remand, Sherman was convicted of child neglect. He died, however, during the pendency of his appeal.[1]

Initially, the trial court also dismissed the charge against the Defendant based upon a 2005 amendment to section 39-15-401 that made the child neglect portion of the statute applicable only to children under thirteen years of age. See Act of June 22, 2005, ch. 487, § 1, 2005 Tenn. Pub. Acts 1183, 1183-84.[2] The Court of Criminal Appeals reversed the

---

[1] Sherman's death during the appeal abated his conviction. State v. Crank, No. E2012-01189-CCA-R3-CD (Tenn. Crim. App. Jan. 4, 2013) (order).

[2] In 2006, the General Assembly again amended the statute to make the child neglect provisions
(continued...)

judgment of the trial court and reinstated the indictment, holding that the 2005 amendment was not retroactively applicable. State v. Sherman, No. E2006-01226-CCA-R3-CD, 2007 WL 2011032, at *4-5 (Tenn. Crim. App. July 12, 2007).

On remand to the trial court, the Defendant moved to dismiss the charge on other grounds. Relying upon the Due Process, Establishment, and Equal Protection Clauses of the Federal Constitution and the corresponding provisions of the Tennessee Constitution, the Defendant challenged the constitutionality of the child abuse and neglect statute based upon the "spiritual treatment" exemption set out in Tennessee Code Annotated section 39-15-402(c) (Supp. 2001) (amended 2005). The exemption provides that child abuse and neglect do not occur when a child is "provided treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof in lieu of medical or surgical treatment." The Defendant also sought relief pursuant to Tennessee's Preservation of Religious Freedom Act, which prohibits the State from "substantially burden[ing] a person's free exercise of religion" unless the State shows that the burden is "[e]ssential to further a compelling governmental interest" and constitutes "[t]he least restrictive means of furthering that compelling governmental interest." Tenn. Code Ann. § 4-1-407(c)(1)–(2) (2011).

On January 12, 2009, the trial court conducted a pre-trial hearing to address the effect of the spiritual treatment exemption on the charge of neglect. The Defendant, who described Jessica as a strong believer whose "focus was upon Jesus Christ," acknowledged that in 2002 she discovered that Jessica "had a problem with her shoulder" and took her first to a chiropractor and later to a nurse practitioner at a walk-in clinic. Eventually, Jessica's symptoms became more pronounced, and the Defendant "knew there was a problem" when Jessica developed "a grapefruit size tumor on her shoulder." The Defendant testified that as a "devout Christian," she decided

> to turn to Jesus Christ, my Lord and my Savior, my Healer, Defender for [Jessica's] healing. That being a believer in the Lord, being a believer in this Word, that He was the only Healer. And through that belief we took it in our hands to pray for her, to heal her with prayer, to know that Jesus Christ is the Healer, is the Deliverer.

---

[2](...continued)
applicable to all children under the age of eighteen. Act of June 20, 2006, ch. 939, § 1, 2006 Tenn. Pub. Acts 2391, 2391 (codified as amended at Tenn. Code Ann. § 39-15-401(b) (2014)).

She and Jessica prayed together, read scriptures, and enlisted churches across the country to pray for Jessica's return to good health. Shortly before Jessica's death, the Department of Children's Services took her into its custody and authorized medical treatment.

At the conclusion of the hearing, the trial court rejected the Defendant's constitutional claims and denied the Defendant's motion to dismiss. The State and the Defendant then consented to a bench trial based upon the Defendant's prior testimony on the motion to dismiss and affidavits submitted by several other witnesses.

Dr. Guy Wells, the Lenoir City chiropractor who had examined Jessica, provided the following testimony by affidavit:

> [O]n February 11, 2002[,] I had an occasion to examine and x-ray a child identified to me as Jessica Crank. She was brought to my office by her mother . . . . A brief exam of the child was given, an x-ray was taken, and . . . she was instructed to return on February 18, 2002. [The Defendant], along with the child Jessica Crank and an individual identified as Ariel Sherman, who signed Jessica Crank in as her father, did return on February 18, 2002. Based upon an additional x-ray and examination of Jessica Crank, I informed [the Defendant] and Ariel Sherman that I could not treat her and that she needed to be taken to an emergency room immediately. . . . [H]er condition was quite serious and it appeared likely to be some sort of malignancy. Before leaving my office, [the Defendant] and Ariel Sherman indicated they would take Jessica Crank to an emergency room.
>
> Later on February 18, 2002, Ariel Sherman called me, identifying himself as Jessica Crank's father, and informed me that he was not taking her to an emergency room but that he had gotten a telephone diagnosis from a Boston doctor of Green Stick Fracture and was taking her to Boston to see the doctor there.

Tracy Gartman, the nurse practitioner who had observed Jessica at the walk-in clinic, testified by affidavit as follows:

> On May 6, 2002[,] I had occasion to examine a child identified to me as Jessica Crank who presented with a severely swollen left shoulder and appeared to be in severe pain. An x-ray of Jessica Crank's shoulder was taken and I was able to identify bone disintegration and other indications of a serious medical condition requiring immediate treatment.

-4-

To that end, these indications on the x-ray were pointed out to her mother, [the Defendant], the significance and seriousness of her medical condition was discussed[,] and she was instructed to take her child, Jessica Crank, immediately to the U.T. Emergency Room. I arranged with a physician at the U.T. Emergency Room to be ready for her arrival for further diagnosis and treatment of her condition. Thereafter, . . . U.T. was contacted and at that time I discovered that [the Defendant] and Jessica Crank had never arrived at the Emergency Room. Based upon this finding, local law enforcement was notified of the above described incident.

Officer Lynette Ladd of the Lenoir City Police Department also submitted an affidavit. She attested that she had received a complaint of possible child neglect following Jessica's visit to the walk-in clinic. With the assistance of the Department of Children's Services, Officer Ladd removed Jessica from the custody of the Defendant and promptly took her to the East Tennessee Children's Hospital in Knoxville.

Dr. Victoria Castaneda, a physician at the East Tennessee Children's Hospital, also testified by affidavit:

Jessica Crank, then in the custody of the Department of Human Services, was admitted to East Tennessee Children's Hospital in late June 2002 where she remained undergoing treatment and care until being released under hospice care, eventually succumbing to her cancer on September 15, 2002.

I can state, based upon my training, experience[,] and treatment of Jessica Crank, that her death was a proximate result of Ewing's Sarcoma. A delay in the treatment of her disease results in a more massive tumor and renders the patient more symptomatic. While earlier treatment would not likely have resulted in her being cured, it would have helped in dealing with her condition and symptoms and positively impacted the quality of her life.

With prompt treatment beginning in February 2002 the quality and length of her remaining life would have been improved and medical personnel would have been better able to manage her pain and disability.

After the submission of all proof, the Defendant argued for acquittal based upon the spiritual treatment exemption. In response, the State "[d]id not question at all the faith and the belief of the [Defendant]," but did challenge the "legitimacy of the . . . Universal Life Church" as a "recognized denomination." Without addressing the specific requirements of the spiritual treatment exemption, the trial court found the Defendant guilty of child neglect,

-5-

a Class A misdemeanor, and imposed a sentence of eleven months and twenty-nine days, all to be served on unsupervised probation. The Court of Criminal Appeals affirmed the conviction and sentence, holding that it was unnecessary to address the Defendant's constitutional claims or to remand for further consideration of the terms of the Preservation of Religious Freedom Act. State v. Crank, No. E2012-01189-CCA-R3-CD, 2013 WL 5371627, at *6-8 (Tenn. Crim. App. Sept. 26, 2013). This Court granted the Defendant permission to appeal.

## II. Standard of Review

The issues in this appeal involve constitutional and statutory interpretation. We review these questions de novo, affording no presumption of correctness to the conclusions of the trial court. Mansell v. Bridgestone Firestone N. Am. Tire, LLC, 417 S.W.3d 393, 399 (Tenn. 2013) (citing Waters v. Farr, 291 S.W.3d 873, 882 (Tenn. 2009)); In re Baby, No. M2012-01040-SC-R11-JV, 2014 WL 4815211, at *6 (Tenn. Sept. 18, 2014).

## III. Analysis

The Defendant has presented three issues in this appeal: (1) whether the spiritual treatment exemption renders the child abuse and neglect statute unconstitutionally vague; (2) whether the spiritual treatment exemption violates the Establishment Clause or the Defendant's right to equal protection; and (3) whether the Defendant is entitled to a hearing in order to assert a defense pursuant to the Preservation of Religious Freedom Act.

## A. Legislative History[3]

The original version of the child abuse and neglect statute, which was enacted in 1989, provided that "[a]ny person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury or neglects such a child so as to adversely affect the child's health and welfare commits a Class A misdemeanor." Act of May 24, 1989, ch. 591, § 1, 1989 Tenn. Pub. Acts 1169, 1235. In 1994, the statute was amended to increase the penalty to a Class D felony for abuse of a child age six or under. Act of Apr. 21, 1994, ch. 978, § 1, 1994 Tenn. Pub. Acts 982, 982 (the "1994 Act").

The General Assembly enacted the spiritual treatment exemption as a provision of the 1994 Act. Act of Apr. 21, 1994, ch. 978, § 8, 1994 Tenn. Pub. Acts 982, 983. Initially, the House voted 93–0 in favor of a version of the 1994 Act which did not include the spiritual treatment exemption. Hearing on H.B. 2427, 98th Gen. Assemb., Reg. Sess. 2 (Tenn. Mar.

_____

[3] The Defendant cites the legislative history of the spiritual treatment exemption in connection with her argument that the exemption violates the Establishment Clause. Although we do not reach the merits of the Establishment Clause challenge for the reasons outlined below, we recite the legislative history because it is relevant to our consideration of the vagueness issue.

21, 1994). The Senate Judiciary Committee then proposed an amendment containing the spiritual treatment exemption; when the amendment came before the Senate, Senator Jim Holcomb explained it as follows: "The amendment was offered by the Christian Scientists, and it ensures that they are protected. I don't have the amendment in front of me, but it was offered by that group, and that is the reason that I put it in." Hearing on S.B. 2562, 98th Gen. Assemb., Reg. Sess. 2 (Tenn. Apr. 21, 1994) (statement of Sen. Holcomb). The amendment was seconded and adopted by the Senate without further discussion. Id. Later on the same day, the House took up consideration of the amendment, and Representative J.B. Napier, the primary House sponsor, recognized the amendment as "relative to the Christian Science religion, which I have no objection to." Hearing on H.B. 2427, 98th Gen. Assemb., Reg. Sess. 2 (Tenn. Apr. 21, 1994) (statement of Rep. Napier). The House voted 94–0 to concur in the amendment. Id.

There were minor amendments made to the exemption in 1998, and the version applicable in this case provides as follows:

> Nothing in this chapter shall be construed to mean a child is neglected, abused, or abused or neglected in an aggravated manner for the sole reason the child is being provided treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof in lieu of medical or surgical treatment.

Act of Apr. 29, 1998, ch. 1040, § 1, 1998 Tenn. Pub. Acts 911, 911.[4]

---

[4] As noted, subsequent amendments to section 39-15-401 modified the statutory age ranges. See Act of June 20, 2006, ch. 939, § 1, 2006 Tenn. Pub. Acts 2391, 2391; Act of June 22, 2005, ch. 487, § 1, 2005 Tenn. Pub. Acts 1183, 1183-84. The version of section 39-15-401 currently in effect provides, in pertinent part, as follows:

> (a) Any person who knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury commits a Class A misdemeanor; provided, however, that, if the abused child is eight (8) years of age or less, the penalty is a Class D felony.

> (b) Any person who knowingly abuses or neglects a child under eighteen (18) years of age, so as to adversely affect the child's health and welfare, commits a Class A misdemeanor; provided, that, if the abused or neglected child is eight (8) years of age or less, the penalty is a Class E felony.

Tenn. Code Ann. § 39-15-401(a)–(b) (2014). The current version of the spiritual treatment exemption, which

(continued...)

-7-

## B. Vagueness

The first issue is whether the child abuse and neglect statute, read together with the spiritual treatment exemption, is unconstitutionally vague.

"'It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined.'" State v. Pickett, 211 S.W.3d 696, 704 (Tenn. 2007) (quoting Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). By virtue of the Due Process Clause of the Fourteenth Amendment to the Federal Constitution and article I, section 8 of the Tennessee Constitution, a criminal statute cannot be enforced when it prohibits conduct "'in terms so vague that [persons] of common intelligence must necessarily guess at its meaning and differ as to its application.'" Id. (quoting Leech v. Am. Booksellers Ass'n, 582 S.W.2d 738, 746 (Tenn. 1979)). The primary purpose of the vagueness doctrine is to ensure that our statutes provide fair warning as to the nature of forbidden conduct so that individuals are not "held criminally responsible for conduct which [they] could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617 (1954). In evaluating whether a statute provides fair warning, the determinative inquiry "is whether [the] statute's 'prohibitions are not clearly defined and are susceptible to different interpretations as to what conduct is actually proscribed.'" Pickett, 211 S.W.3d at 704 (quoting State v. Forbes, 918 S.W.2d 431, 447-48 (Tenn. Crim. App. 1995)); see also State v. Whitehead, 43 S.W.3d 921, 928 (Tenn. Crim. App. 2000).

A second, related purpose of the vagueness doctrine is to ensure that our criminal laws provide "minimal guidelines to direct law enforcement." State v. Smith, 48 S.W.3d 159, 165 (Tenn. Crim. App. 2000) (citing Forbes, 918 S.W.2d at 448). The vagueness doctrine does not permit a statute that "authorizes and encourages arbitrary and discriminatory enforcement," State v. Harton, 108 S.W.3d 253, 259 (Tenn. Crim. App. 2002) (citing City of Chicago v. Morales, 527 U.S. 41, 56 (1999)), which typically occurs when a statute "delegates basic policy matters to policemen, judges, and juries for resolution on an *ad hoc*

---

[4](...continued)
is basically the same as the version applicable here, provides as follows:

> Nothing in this part shall be construed to mean a child is abused, neglected, or endangered, or abused, neglected or endangered in an aggravated manner, for the sole reason the child is being provided treatment by spiritual means through prayer alone, in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner of the recognized church or religious denomination, in lieu of medical or surgical treatment.

Id. § 39-15-402(c) (2014).

and subjective basis," Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 531 (Tenn. 1993) (citing Grayned, 408 U.S. at 108-109).

Despite the importance of these constitutional protections, this Court has recognized the "inherent vagueness" of statutory language, Pickett, 211 S.W.3d at 704, and has held that criminal statutes do not have to meet the unattainable standard of "absolute precision," State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1976); see also State v. Lyons, 802 S.W.2d 590, 592 (Tenn. 1990) ("The vagueness doctrine does not invalidate every statute which a reviewing court believes could have been drafted with greater precision, especially in light of the inherent vagueness of many English words."). In evaluating a statute for vagueness, courts may consider the plain meaning of the statutory terms, the legislative history, and prior judicial interpretations of the statutory language. See Lyons, 802 S.W.2d at 592 (reviewing prior judicial interpretations of similar statutory language); Smith, 48 S.W.3d at 168 ("The clarity in meaning required by due process may . . . be derived from legislative history.").

We must first consider whether it is appropriate to consider the merits of the vagueness challenge in this case. The State maintains that "[a]rguably, this issue should be avoided" because "if the spiritual treatment exemption is unconstitutionally vague, the appropriate response would be to strike the . . . exemption, which would provide the [D]efendant no relief." We disagree. Because a vague statute fails to provide the required notice at the time of the commission of the offense, the U.S. Supreme Court has consistently reversed convictions upon finding that a statute is unconstitutionally vague. See, e.g., United States v. Cardiff, 344 U.S. 174, 176 (1952) (reversing conviction pursuant to vague statute); Lanzetta v. New Jersey, 306 U.S. 451, 458 (1939) (same); see also Harriss, 347 U.S. at 617 (explaining that "no man shall be held criminally responsible" pursuant to a vague statute). The U.S. Supreme Court has also warned against upholding the application of a vague statute based on an ex post facto construction:

> [W]here vague statutes are concerned, . . . the vice in such an enactment cannot "be cured in a given case by a construction in that very case placing valid limits on the statute," for "the objection of vagueness is two-fold: inadequate guidance to the individual whose conduct is regulated, and inadequate guidance to the triers of fact. The former objection could not be cured retrospectively by a ruling either of the trial court or the appellate court . . . ."

Bouie v. City of Columbia, 378 U.S. 347, 353 (1964) (quoting Paul A. Freund, The Supreme Court and Civil Liberties, 4 Vand. L. Rev. 533, 541 (1951)). In this instance, were we to find the provisions at issue to be vague, we could not properly address the vagueness problem by eliminating the entire spiritual treatment exemption and upholding the conviction. That

approach would not remedy the statute's failure to provide the requisite fair warning at the time of the offense. Because the Defendant is entitled to a reversal of her conviction if she prevails on her vagueness claim, this issue cannot be avoided in the manner suggested by the State.

It is unclear whether the Defendant contends in this appeal that the spiritual treatment exemption is unconstitutional as applied to her particular circumstances.[5] To the extent that the Defendant seeks to present an as-applied challenge, we decline to address it because the Defendant has made no effort to show that the exemption applies under the facts of this case. For example, the Defendant failed to offer evidence that the spiritual healing provided was in accordance with the "tenets or practices" of her church, which is one of the express requirements to qualify for the exemption. Tenn. Code Ann. § 39-15-402(c). Moreover, the Defendant has not challenged the finding of the trial court that she did not qualify for the exemption.[6] Thus, the Defendant is in no position to assert an as-applied challenge to the constitutionality of the statute on the basis of vagueness.

The Defendant does, however, assert a facial challenge, claiming that the terms of the statute, as written, fail to clearly delineate the nature of the prohibited conduct. "It is well recognized . . . that '[a] facial challenge to a legislative [a]ct is . . . the most difficult challenge to mount successfully since the challenger must establish that no set of circumstances exist under which the Act would be valid.'" Davis-Kidd Booksellers, Inc., 866 S.W.2d at 525 (second alteration in original) (quoting United States v. Salerno, 481 U.S. 739, 745 (1987)). It is typically preferable for courts to address constitutional challenges on an as-applied basis, thereby limiting the analysis to the facts of the case at hand. Notably, however, both the U.S. Supreme Court and this Court have held that, when First Amendment rights are at issue, a court is not required to limit its analysis of a vagueness challenge to the particular facts presented. See Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 n.7 (1982) ("'[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand.'" (emphasis added) (quoting United States v. Mazurie, 419 U.S. 544, 550 (1975))); City of Knoxville v. Entm't Res., LLC, 166 S.W.3d 650, 659 (Tenn. 2005) ("[I]n some

_____

[5] In contrast to a facial challenge, which involves the constitutionality of the statute as written, "[a]n 'as applied' challenge to the constitutionality of a statute is evaluated considering how it operates in practice against the particular litigant and under the facts of the instant case, not hypothetical facts in other situations." City of Memphis v. Hargett, 414 S.W.3d 88, 107 (Tenn. 2013) (quoting 16 C.J.S. Constitutional Law § 187, at 274 (2005)).

[6] As courts in other jurisdictions have recognized, whether a defendant meets the criteria of the spiritual treatment exemption is a question for the trier of fact. See Bergmann v. State, 486 N.E.2d 653, 661 (Ind. Ct. App. 1985); Commonwealth v. Twitchell, 617 N.E.2d 609, 619-20 (Mass. 1993).

circumstances even a party who is within the ambit of an ordinance may challenge it as facially vague if protected communication is at issue."). Because the vagueness challenge here implicates the Defendant's First Amendment right to the free exercise of religion, it is appropriate to address the merits of her facial vagueness challenge even though she does not argue that the spiritual treatment exemption applies under the facts of this case and does not dispute the trial court's holding that the exemption is not applicable to her.

Although the child abuse and neglect statute has been upheld against a vagueness challenge, State v. Prater, 137 S.W.3d 25, 32 (Tenn. Crim. App. 2003), this is a case of first impression as to whether the child abuse and neglect statute, when read in combination with the spiritual treatment exemption, violates due process principles. Courts in two other states have sustained similar vagueness challenges.

In Hermanson v. State, a husband and wife who were members of a Christian Scientist congregation were convicted of child abuse resulting in third degree murder when their daughter died from untreated juvenile diabetes. 604 So. 2d 775, 775 (Fla. 1992). At the time, Florida's child abuse statute made it unlawful to harm a child through the deprivation of medical treatment, but a separate statute provided that "a parent or other person responsible for the child's welfare legitimately practicing his religious beliefs, who by reason thereof does not provide specified medical treatment for a child, may not be considered abusive or neglectful for that reason alone." Id. at 776 (quoting Fla. Stat. § 415.503(7)(f) (1985)). The Florida Supreme Court reversed the convictions, holding that "'[b]y authorizing conduct in one statute, but declaring that same conduct criminal under another statute,'" the legislature had failed to provide a fair warning that the Hermansons' conduct would result in criminal liability. Id. at 782 (quoting Christine A. Clark, Religious Accommodation and Criminal Liability, 17 Fla. St. U. L. Rev. 559, 585 (1990) [hereinafter Clark, Religious Accommodation]).

The Ohio Court of Common Pleas for Coshocton County sustained a similar challenge in State v. Miskimens, reversing child endangerment charges based upon the vagueness of Ohio's spiritual treatment provision, which provided an exemption for any person who "treats the physical or mental illness or defect of [his or her] child by spiritual means through prayer alone, in accordance with the tenets of a recognized religious body." 490 N.E.2d 933, 933 & n.1 (Ohio Ct. Comm. Pleas 1984) (citing Ohio Rev. Code Ann. § 2919.22(A)). The Ohio court concluded that the "undefined, imprecise, and in many respects unascertainable, standards set by the [spiritual treatment provision] render [the child endangerment law] so

impermissibly vague even after resort to dictionary definitions that it cannot stand." Id. at 937.[7]

In contrast, the Oklahoma Court of Criminal Appeals upheld the application of a spiritual treatment provision which provided an exemption from the offense of child endangerment when a "parent or guardian, in good faith, selects and depends upon spiritual means alone through prayer, in accordance with the tenets and practice of a recognized church or religious denomination, for the treatment or cure of disease or remedial care of such child." State v. Lockhart, 664 P.2d 1059, 1060 (Okla. Crim. App. 1983) (emphasis omitted) (quoting Okla. Stat. tit. 21, § 852). In Lockhart, the court concluded as follows:

> [T]he statute is clear and unambiguous, and expresses a legislative intent that those parents who rely in good faith upon the [tenets] of their religious belief for the care and protection of their children be allowed a defense to a misdemeanor charge subsequently arising from their failure to obtain medical assistance for their children.

Id.

Consistent with Lockhart, the State contends in this appeal that the provisions at issue are not unconstitutionally vague because "the spiritual treatment exemption, taken together with the prohibition in [section] 39-15-401, reasonably conveys when otherwise criminal conduct will not be deemed criminal." The Defendant asserts that the rationale expressed by the Florida court in Hermanson and the Ohio court in Miskimens should prevail.

As noted, the spiritual treatment exemption applies only when, "in lieu of medical or surgical treatment," a child is "provided treatment by spiritual means through prayer alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner" of the church or denomination. Tenn. Code Ann. § 39-15-402(c). The Defendant asserts that several of the statutory terms—including

---

[7] As the State points out, the other out-of-state authority relied upon by the Defendant, State v. McKown, 475 N.W.2d 63, 69 (Minn. 1991), is inapposite because it focuses on the due process issue that arises when a parent is charged with an offense (e.g., manslaughter) in a statute that does not include a spiritual treatment exemption, even though the parent would be exempt from a charge of child abuse or neglect based on a spiritual treatment exemption. See also Walker v. Superior Court, 763 P.2d 852, 872-73 (Cal. 1988) (rejecting the same type of due process claim at issue in McKown); accord Twitchell, 617 N.E.2d at 617; State v. Hays, 964 P.2d 1042, 1046 (Or. Ct. App. 1998); State v. Neumann, 832 N.W.2d 560, 567-77 (Wis. 2013). Notably, the Florida Supreme Court's decision in Hermanson involved different circumstances—namely, a charge of third degree murder which included a spiritual treatment exemption because it was premised upon the underlying offense of child abuse. 604 So. 2d at 775.

-12-

"treatment," "prayer alone," "tenets or practices," "practitioner," and "recognized church or religious denomination"—are so unclear that neither individuals nor law enforcement officers can ascertain when the statute applies. We do not agree. The plain meaning of the term "to treat," in the healthcare context, is "to deal with (a disease, patient, etc.) in order to relieve or cure." Webster's Encyclopedic Unabridged Dictionary of the English Language 1509 (1989). The term "prayer" is ordinarily defined in the religious context as "a spiritual communication with God or an object of worship, as in supplication, thanksgiving, adoration, or confession." Id. at 1129. By requiring "prayer alone . . . in lieu of medical or surgical treatment," the statute limits the exemption to persons who completely forgo medical care and rely upon prayer as the exclusive means of treatment. See id. at 42 (defining "alone" as "exclusive of all others or all else"). The term "church" is defined as any "religious society, organization, or congregation," id. at 265, and "denomination" refers to "a religious group, usually including many local churches, often larger than a sect," id. at 386.

According to the exemption, the church or denomination must be "recognized," which broadly refers to something that is "acknowledge[d] or treat[ed] as valid." Id. at 1199. Moreover, the exemption requires the spiritual treatment to be provided in accordance with the church's or denomination's "tenets or practices"—terms which collectively refer to the principles, doctrines, and customs of the church or denomination. Id. at 1128, 1463. Finally, the exemption requires that the spiritual treatment be provided by a "duly accredited practitioner"; the term "practitioner" refers generally to "one engaged in the practice of a profession," but is used more narrowly within the Christian Science faith to refer to a person within the church who is "authorized to practice healing." Id. at 1128.

Although the spiritual treatment exemption falls short of "absolute precision," McDonald, 534 S.W.2d at 651, its language is sufficiently clear when "construed according to the fair import of its terms," Tenn. Code Ann. § 39-11-104 (2014) (providing that the provisions of our criminal code "shall be construed according to the fair import of [their] terms, including reference to judicial decisions and common law interpretations, to promote justice, and effect the objectives of the criminal code"). The term "recognized" is troublesome in the sense that it lacks a standard for assessing the status of a particular religious group. That term is less vague, however, when read in the context of the surrounding terminology within the exemption and the legislative history. Viewed in context, it is apparent that the legislative intent was for the exemption to apply to members of religious bodies which, like the Church of Christian Science, are established institutions with doctrines or customs that authorize healers within the church to perform spiritual treatment via prayer in lieu of medical care. Because the exemption is effectively limited to members of religious groups that closely resemble the Christian Science Church, the terms at issue are not so vague that the scope of the exemption "cannot be ascertained." Whitehead, 43 S.W.3d at 929; see also Eric W. Treene, Note, Prayer-Treatment Exemptions

to Child Abuse and Neglect Statutes, Manslaughter Prosecutions, and Due Process of Law, 30 Harv. J. on Legis. 135, 143-44 (1993) (arguing that provisions which require spiritual treatment by a duly accredited practitioner in accordance with the tenets of a recognized church "effectively limit the exemption to Christian Scientists").

In addition, the Defendant's reliance on Hermanson is misplaced because the provisions at issue here do not "'authoriz[e] conduct in one statute, but declar[e] that same conduct criminal under another statute.'" 604 So. 2d at 782 (quoting Clark, Religious Accommodation, 17 Fla. St. U. L. Rev. at 58). Instead, the spiritual treatment exemption protects from prosecution individuals whose conduct would otherwise qualify as child abuse or neglect. See, e.g., State v. Adams, 24 S.W.3d 289, 297 (Tenn. 2000) (holding that a parent's failure to provide medical care for a child may constitute child neglect). Because the exemption protects only those individuals who fit within its specific criteria, it cannot be said that our statutes simultaneously authorize and prohibit the same conduct. Thus, the Defendant is not entitled to relief on her claim of vagueness.

### C. Establishment and Equal Protection Clauses

The Defendant next contends that the spiritual treatment exemption violates the Federal Establishment and Equal Protection Clauses, as well as the comparable provisions in article I, section 3 and article XI, section 8 of the Tennessee Constitution. According to the Defendant, the spiritual treatment exemption improperly favors certain religious groups—particularly Christian Scientists—while denying protection to other religious groups whose practices do not comport with the requirements of the statute. The Defendant contends that she "should not be denied the benefits afforded to Christian Scientists."

The State has not taken a position as to whether the spiritual treatment exemption violates these constitutional provisions. Instead, relying upon State v. Murray, 480 S.W.2d 355 (Tenn. 1972), the State contends that this Court should affirm the conviction without addressing the Defendant's claim because even if the exemption violates the Establishment Clause or the Equal Protection Clause, the result would be to strike the exemption without invalidating the entire child abuse and neglect statute.

The statute at issue in Murray made it a crime to sell or conceal property subject to a security interest, but exempted from prosecution any person who satisfied the underlying debt prior to being arraigned for trial. Id. at 356 (citing Tenn. Code Ann. § 39-1957 (amended 1989)). Murray, who was indicted for the improper sale of a Buick, claimed that the exemption portion of the statute violated article I, section 18 of the Tennessee Constitution, which prohibits imprisonment for debt. Id. This Court held that under those circumstances, there was no need to address the constitutionality of the exemption because,

even assuming that the exemption was unconstitutional, the only remedy would be to elide the exemption in its entirety, which would not entitle Murray to relief. Id. at 356-57.

The main principle underlying the holding in Murray is that "[t]his Court will not pass on the constitutionality of a statute, or any part of one, unless it is absolutely necessary for the determination of the case and of the present rights of the parties to the litigation." Id. at 357; accord State v. Mangrum, 403 S.W.3d 152, 169 n.14 (Tenn. 2013) (citing State v. Taylor, 70 S.W.3d 717, 720 (Tenn. 2002)). Thus, the determinative inquiry is whether the Defendant would be entitled to relief in the event of a successful challenge. The Defendant has presented two alternative arguments for relief: (1) that the unconstitutionality of the spiritual treatment exemption would preclude altogether her prosecution under the child abuse and neglect statute; and (2) that she would qualify for the spiritual treatment exemption once this Court elides the offending terminology. In response, the State contends that if the spiritual treatment exemption were unconstitutional, the proper remedy would be to elide the exemption in its entirety, leaving in effect the portion of the statute prohibiting child abuse and neglect. We agree with the State.

"The doctrine of elision allows a court, under appropriate circumstances when consistent with the expressed legislative intent, to elide an unconstitutional portion of a statute and find the remaining provisions to be constitutional and effective." State v. Tester, 879 S.W.2d 823, 830 (Tenn. 1994) (citing Lowe's Cos. v. Cardwell, 813 S.W.2d 428, 430 (Tenn. 1991)). Furthermore, the General Assembly has approved the practice of elision through the enactment of a general severability statute, which provides as follows:

> It is hereby declared that the sections, clauses, sentences and parts of the Tennessee Code are severable, are not matters of mutual essential inducement, and any of them shall be exscinded if the [C]ode would otherwise be unconstitutional or ineffective. If any one (1) or more sections, clauses, sentences or parts shall for any reason be questioned in any court, and shall be adjudged unconstitutional or invalid, such judgment shall not affect, impair or invalidate the remaining provisions thereof, but shall be confined in its operation to the specific provision or provisions so held unconstitutional or invalid . . . .

Tenn. Code Ann. § 1-3-110 (2014). This legislative endorsement of elision "does not automatically make it applicable to every situation; however, when a conclusion can be reached that the legislature would have enacted the act in question with the unconstitutional portion omitted, then elision of the unconstitutional portion is appropriate." In re Swanson, 2 S.W.3d 180, 189 (Tenn. 1999); see also Tester, 879 S.W.2d at 830 ("The rule of elision applies if it is made to appear from the face of the statute that the legislature would have

-15-

enacted it with the objectionable features omitted . . . ." (quoting Gibson Cnty. Special Sch. Dist. v. Palmer, 691 S.W.2d 544, 551 (Tenn. 1985))).

Applying these principles, we reject the Defendant's contention that the invalidity of the spiritual treatment exemption would preclude altogether the enforcement of the statute prohibiting child abuse and neglect. The General Assembly enacted the child abuse and neglect statute in 1989 without a spiritual treatment exemption. The law remained in effect with no exemption until the 1994 Act. There is clearly a compelling state interest to protect children from abuse or neglect, and there is no indication that the General Assembly would have repealed the statute had it been unable to enact the spiritual treatment exemption. Under these circumstances, we hold that enforcing the child abuse and neglect statute without the spiritual treatment exemption is "consistent with the expressed legislative intent." Tester, 879 S.W.2d at 830.

We must next consider whether the Defendant would be entitled to relief if we were to elide the allegedly unconstitutional terminology within the spiritual treatment exemption. This would require the deletion of the words "alone in accordance with the tenets or practices of a recognized church or religious denomination by a duly accredited practitioner thereof." Tenn. Code Ann. § 39-15-402(c) (Supp. 2001). Eliding the statute in this manner would extend the exemption to any parent who "provide[s] treatment by spiritual means through prayer . . . in lieu of medical or surgical treatment." Id. The State maintains—and we agree—that eliding the statute in this way would expand the scope of the exemption beyond what was intended by the General Assembly. While broadening the statutory exemption might serve to address any constitutional deficiencies, we cannot say that our legislature would have enacted an exemption so broad that it would encompass all instances in which a parent claims reliance upon prayer in lieu of medical treatment for a child. The doctrine of elision is not a proper means "to completely re-write or make-over a statute." Shelby Cnty. Election Comm'n v. Turner, 755 S.W.2d 774, 778 (Tenn. 1988); see also Tester, 879 S.W.2d at 830 (declining to use elision to expand the scope of an unconstitutional work release statute because to do so would amount to "indulging in judicial legislation"). Thus, application of the doctrine of elision in this instance would eliminate entirely the spiritual treatment exemption while preserving the terms of the statute prohibiting child abuse and neglect. See Boone v. Boozman, 217 F. Supp. 2d 938, 952 (E.D. Ark. 2002) (eliding entire religious exemption to compulsory immunization because it was improper "to re-write the immunization statute to fashion a broader exemption that the General Assembly may not have contemplated or intended"). Because the elision of the spiritual treatment exemption and the preservation of the remainder of the child abuse and neglect statute is consistent with the expressed legislative intent, the Defendant would not be entitled to relief even if we were to hold that the spiritual treatment exemption violates the Establishment Clause or the Equal

Protection Clause. Accordingly, we must affirm the Defendant's convictions without ruling on these constitutional claims.[8]

### D. Preservation of Religious Freedom Act

The Defendant further contends that she is entitled to a hearing pursuant to Tennessee's Preservation of Religious Freedom Act, which provides, in pertinent part, as follows:

> (b) Except as provided in subsection (c), no government entity shall substantially burden a person's free exercise of religion even if the burden results from a rule of general applicability.
>
> (c) No government entity shall substantially burden a person's free exercise of religion unless it demonstrates that application of the burden to the person is:
>
>> (1) Essential to further a compelling governmental interest; and

---

[8] We acknowledge that the Establishment Clause issue gives us pause, as the statutory text and the legislative history, taken together, appear to indicate that the spiritual treatment exemption was enacted for the benefit of the Christian Scientist denomination of the Christian faith. The Establishment Clause provides that "Congress shall make no law respecting an establishment of religion," U.S. Const. amend. I, and the corresponding provision in the Tennessee Constitution provides "that no preference shall ever be given, by law, to any religious establishment or mode of worship," Tenn. Const. art. I, § 3. In Larson v. Valente, 456 U.S. 228, 244 (1982), the U.S. Supreme Court held that "[t]he clearest command of the Establishment Clause is that one religious denomination cannot be officially preferred over another." The Court's explication in Larson reflects the view of James Madison, the author of the First Amendment, who asserted that "[t]o give exemption to some denominations and not to all offends the equality with which all men enter society." James Madison, Memorial and Remonstrance Against Religious Assessments (June 20, 1785), reprinted in John T. Noonan, Jr., The Lustre of Our Country: The American Experience of Religious Freedom 73 (1998). Applying these principles, courts in other jurisdictions have questioned spiritual treatment exemptions similar to our own. See, e.g., Walker, 763 P.2d at 876 (Mosk, J., concurring) ("[T]he [E]stablishment [C]lause requires at a minimum that the exemption be granted irrespective of denominational affiliation or practice. The conclusion is thus inescapable that the religious exemption . . . violates the establishment clauses of the California and federal [c]onstitutions." (footnote and citations omitted)); Newmark v. Williams, 588 A.2d 1108, 1112 (Del. 1991) ("[W]e recognize the possibility that the spiritual treatment exemptions may violate the ban against the establishment of an official State religion guaranteed under both the Federal and Delaware Constitutions. Clearly . . . the language providing an exemption only to those individuals practicing 'in accordance' with the 'practices of a recognized church or religious denomination by a duly accredited practitioner thereof' is intended for the principal benefit of Christian Scientists."); Miskimens, 490 N.E.2d at 934-35 (concluding that Ohio's spiritual treatment exemption violated both the Establishment Clause and the Equal Protection Clause).

(2) The least restrictive means of furthering that compelling governmental interest.

. . . .

(e) A person whose religious exercise has been burdened by government in violation of this section may assert that violation as a claim or defense in any judicial or administrative proceeding . . . .

Tenn. Code Ann. § 4-1-407(b)–(c), (e).

Prior to trial, the Defendant claimed that the State had burdened the free exercise of her religion by charging her with child neglect. The Defendant asked the trial court to dismiss the charge pursuant to the Preservation of Religious Freedom Act unless the State could establish that the prosecution was essential to further a compelling governmental interest and was the least restrictive means of furthering that interest. The trial court concluded that the Preservation of Religious Freedom Act, which took effect in 2009, did not apply retroactively.

This Court has recognized two circumstances that make it appropriate to apply a statute retroactively: (1) when the "clear legislative intent" mandates retroactive application, Van Tran v. State, 66 S.W.3d 790, 797 (Tenn. 2001); and (2) when the statute is "remedial or procedural in nature" such that it "does not affect the vested rights or liabilities of the parties," Nutt v. Champion Int'l Corp., 980 S.W.2d 365, 368 (Tenn. 1998). In this instance, there is nothing in the Preservation of Religious Freedom Act or its legislative history demonstrating that the General Assembly intended for the statute to apply retroactively. See Van Tran, 66 S.W.3d at 798 ("[T]he absence of express language providing for retroactive application supports the conclusion that the legislature did not expressly intend such an application."). Moreover, because the Defendant seeks to use the statute to establish a defense to a criminal charge, it would substantially "affect the vested rights or liabilities of the parties," and cannot, therefore, be properly classified as "remedial or procedural in nature." Nutt, 980 S.W.2d at 368. Accordingly, like the Court of Criminal Appeals, we hold that the Preservation of Religious Freedom Act does not apply retroactively and cannot afford relief to the Defendant.

### IV. Conclusion

The Defendant is not entitled to relief on her constitutional or statutory claims. The judgment of the Court of Criminal Appeals is, therefore, affirmed. It appearing that the Defendant is indigent, costs of this appeal are taxed to the State of Tennessee.

_____
GARY R. WADE, JUSTICE