FILED
01/14/2021
Clerk of the
Appellate Courts

IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
May 28, 2020 Session[1]

## STATE OF TENNESSEE v. ROBERT JASON ALLISON

**Appeal by Permission from the Court of Criminal Appeals
Criminal Court for Davidson County
No. 2010-C-2264    Mark J. Fishburn, Judge**

_____

### No. M2017-02367-SC-R11-CD

_____

We granted permission to appeal to the Defendant to examine the propriety of his convictions for money laundering based on his receipt of payment for drugs he "fronted" to a confidential informant.  On separate occasions, the Defendant delivered a quantity of marijuana to the informant.  At the time of delivery, the informant paid the Defendant for a portion of marijuana, but the Defendant also fronted additional marijuana to the informant, meaning the Defendant had an expectation that he would be paid later with proceeds from the informant's sale of the drugs.  The Defendant subsequently received payment.  Based on these actions, the Defendant was charged with and convicted of two counts of delivering marijuana and two counts of money laundering.  See Tenn. Code Ann. § 39-14-903(c)(1) (2006); Tenn. Code Ann. § 39-17-417(a)(2) (2006 & Supp. 2008).  The Defendant challenged whether the evidence supported his money laundering convictions, whether those convictions violated double jeopardy protections, and whether the money laundering statute was unconstitutionally vague.  The trial court rejected the Defendant's challenges, and the Court of Criminal Appeals affirmed the trial court's judgments.  We hold that the evidence supporting one of the money laundering convictions was legally sufficient, because the proof supported an inference that the Defendant purchased marijuana with the proceeds he had received with the intent to promote the carrying on of the sale of marijuana.  With respect to the second money laundering conviction, we hold that the evidence was insufficient, because the proof showed only that the Defendant received payment for drugs he had fronted.  We further hold that the Defendant's punishment for both delivery of marijuana and money laundering does not violate double jeopardy protections and that the money laundering statute is not unconstitutionally vague by virtue of its use of the undefined phrase "carrying on."  Accordingly, we affirm in part and reverse in part the decision of the Court of Criminal Appeals.

_____

[1] We heard oral argument through videoconference under this Court's emergency orders restricting court proceedings because of the COVID-19 pandemic.

**Tenn. R. App. P. 11 Appeal by Permission;**
**Judgment of the Court of Criminal Appeals Affirmed in Part and Reversed in Part;**
**Case Remanded to the Trial Court for Entry of Corrected Judgments**

JEFFREY S. BIVINS, C.J., delivered the opinion of the Court, in which CORNELIA A. CLARK, SHARON G. LEE, HOLLY KIRBY, AND ROGER A. PAGE, JJ., joined.

Richard C. Strong, Nashville, Tennessee (on appeal), and Robert Jason Allison, Nashville, Tennessee, Pro Se (at trial) for the appellant, Robert Jason Allison.

Herbert H. Slatery III, Attorney General and Reporter; Andrée Blumstein, Solicitor General; David H. Findley, Senior Assistant Attorney General; Glenn R. Funk, District Attorney General; and Andrea Green, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I.   FACTUAL AND PROCEDURAL BACKGROUND

In January 2009, law enforcement officers specializing in drug trafficking investigations honed in on Robert Jason Allison ("Defendant"). Officers previously had discovered several pounds of marijuana in a woman's residence. The woman revealed that she had obtained the marijuana from the Defendant and agreed to cooperate with officers as a confidential informant ("CI").

On January 9, 2009, the CI telephoned the Defendant to arrange a purchase of five pounds of marijuana at a price of $1,000 per pound. She was provided $5,000 in cash by the officers overseeing the buy.[2] The CI agreed to wear a transmitter when she met with the Defendant that allowed officers to hear and record the conversations between her and the Defendant. When the CI met with the Defendant to buy the five pounds of marijuana, the Defendant revealed that he had ten pounds of marijuana in his possession and asked the CI if she would like more than five pounds. The CI stated that she had sufficient funds for only five pounds. The Defendant then asked the CI how long it would take her to pay him for three extra pounds. The CI responded that she could probably pay him in three or

---

[2] Officers photocopied the cash so that they would have a record of the serial numbers of the currency provided to the Defendant. Officers did the same on each of the three subsequent occasions that the CI gave the Defendant cash.

2

four days. As they discussed the matter, the Defendant told the CI that he believed the marijuana could be divided and sold for a total of $1,200 to $1,300 per pound, and he gave her tips on how best to market and sell it.[3] Ultimately, the Defendant decided to "front" the CI three extra pounds of marijuana.[4] The CI left with eight zip-lock bags of marijuana.[5]

True to her word, the CI met with the Defendant again four days later on January 13, this time for the sole purpose of paying the Defendant what he was owed. The CI gave the Defendant $3,000 in cash that had been provided to her by law enforcement officers. The Defendant mentioned that he was hoping to receive more marijuana in the near future, stating that he was "tryin' to get [his] money together" because he wanted to "try to get somethin' else." The CI asked the Defendant when he expected to have the additional marijuana. The Defendant—after a telephone call discussing timing with his supplier— responded that he believed he would have more marijuana the next night.

The CI met with the Defendant three days later on January 16, this time to make another purchase of marijuana. She once again carried with her $5,000 in cash provided by law enforcement officers. The Defendant told the CI he had twenty-five bags of marijuana, stating that he had received the marijuana the prior night and complaining that it had taken him "forever" to "break up" the product. The Defendant offered the CI a better price on this occasion—$850 per pound—telling her that anytime he acquired the product more cheaply, he would pass along some of the savings to her. At $850 per pound, the CI could afford to purchase six pounds with the $5,000 she had been provided, owing the Defendant $100. As before, however, the Defendant asked the CI if she wanted more, inquiring whether she wanted to take ten pounds. The Defendant also confirmed that he had already paid his supplier, and thus he was not in a rush to be paid for the fronted marijuana and would accept payment "whenever [the CI was] ready." During this meeting, the Defendant offered the CI still more tips on selling the drugs. The CI left with ten zip-

---

[3] The Defendant also gave the CI tips on how to identify law enforcement officers, advised her not to keep all of her product in one place, and revealed that the phone he used was not in his name.

[4] The term "front," as used in the drug trade, refers to instances when a seller gives drugs to a buyer on credit with the understanding that when the buyer re-sells the drugs to customers, the proceeds of those sales will be used to pay the seller. See, e.g., United States v. Torres, 53 F.3d 1129, 1133 n.1 (10th Cir. 1995).

[5] Forensic analysis confirmed the product to be marijuana and established the total weight to be 7.88 pounds.

lock bags of marijuana.[6]  As a result, the CI owed the Defendant $3,400 for the four fronted pounds of marijuana (at $850 per pound) and $100 as the remainder of the price due for the six pounds she purchased on January 16.

The CI next met the Defendant four days later on January 20, this time to pay for the marijuana that had been fronted to her on January 16.  She was provided $3,000 by law enforcement officers, even though she owed the Defendant $3,500.  The CI paid the Defendant $3,000 and acknowledged that she still owed him $500.  On this occasion, the Defendant showed the CI a sample he had of new marijuana that had "just come off the truck" and told her that he would be getting "fifty."  The Defendant remarked that his supplier was charging him $800 and stated that he would be content to sell this marijuana to the CI for only $850.  Ultimately, the CI took a small portion of the marijuana sample with her and told the Defendant that she would let him know what she thought of it.

During this January 20 meeting, the Defendant made comments indicating that his supplier was removing marijuana from the containers it had been transported in and that he was planning to obtain marijuana from his supplier.  Based on these comments and the Defendant's prior drug transactions, law enforcement officers conducted surveillance of the two residences the Defendant frequented and obtained search warrants.

On January 21, officers observed the Defendant arrive at one of the residences and unload a green plastic tub from his truck into the garage behind the residence.  Officers then converged on both residences, executed the search warrants, and took the Defendant into custody.

Officers discovered fourteen bricks[7] of marijuana in the green plastic tub, along with a separate bag of marijuana.[8]  The Defendant agreed to speak to officers at the scene and

---

[6] Forensic analysis confirmed the product to be marijuana and established the total weight to be 9.5 pounds.

[7] A "brick" refers to a compressed form of marijuana, particularly useful for storing quantities of marijuana in compact locations for transport.  On January 9, during the first purchase between the Defendant and the CI, the Defendant revealed that he had obtained the marijuana he delivered to the CI as a "slab" "wrapped up in saran wrap."  The Defendant commented that he preferred to obtain marijuana "wrapped up and untouched because you get overage."

[8] Forensic analysis confirmed the product to be marijuana and established the total weight to be 44.6 pounds.

4

admitted knowing that the green tub contained marijuana. He attempted to deflect responsibility away from other individuals and onto himself.

Officers discovered $2,780 in cash on the Defendant. Of that amount, $2,460 were bills that the CI had paid to the Defendant on January 20. When asked what he did for a living, the Defendant told officers that he was unemployed. The Defendant also told officers that he had obtained the marijuana in the green tub "on credit," meaning that he had been fronted the drugs by his supplier.

Based on these facts, the Defendant was indicted for two counts of delivery of marijuana weighing one-half ounce to ten pounds, see Tenn. Code Ann. § 39-17-417(a)(2), (g)(1), one count of possession with intent to deliver between ten pounds, one gram and seventy pounds of marijuana,[9] see Tenn. Code Ann. § 39-17-417(a)(4), (g)(2), and two counts of money laundering, see Tenn. Code Ann. § 39-14-903(c)(1).[10] In the indictment, each of the offenses was alleged to have occurred on a specific date. The marijuana delivery offenses—counts one and two of the indictment—corresponded to the January 9 and 16 meetings between the Defendant and the CI, when the Defendant gave the CI bags of marijuana. The possession with intent to deliver offense—count three—corresponded to the January 21 date, when the Defendant was arrested with the green tub of marijuana. The money laundering offenses—counts five and six—corresponded to the January 13 and 20 meetings between the Defendant and the CI, when the Defendant received cash from the CI as payment for fronted marijuana.

With respect to money laundering, Tennessee law provides, in part, that:

> It is an offense to knowingly conduct . . . a financial transaction or make other disposition involving property or proceeds represented by . . . another at the direction of a law enforcement officer, to be the property or proceeds derived from a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds *or* with the intent to promote the carrying on of a specified unlawful activity.

Tenn. Code Ann. § 39-14-903(c)(1) (emphasis added). On the two counts of money laundering in this case, the indictment charged the Defendant with knowingly conducting

---

[9] This offense was alleged to have occurred within 1,000 feet of a public school.

[10] The Defendant also was indicted for and ultimately convicted of a firearm offense.

5

a financial transaction or making other disposition involving property or proceeds represented by another at the direction of a law enforcement officer to be property or proceeds derived from the sale of marijuana, with the intent to promote the carrying on of the sale of marijuana.

At the conclusion of trial, the jury convicted the Defendant as charged. Based on the facts adduced at trial and the sentencing hearing, the trial court imposed partial consecutive sentencing that resulted in an effective sentence of twenty-five years imprisonment.

The Defendant timely filed a motion for new trial. Among other issues, the Defendant challenged his convictions for money laundering in three respects. First, the Defendant argued that the evidence was legally insufficient to support the convictions. Second, he argued that the convictions violated double jeopardy protections. Third, he argued that the money laundering statute was unconstitutionally vague.

With regard to his sufficiency argument, the Defendant contended that the evidence showed only two single transactions for the sale of marijuana between him and the CI. The Defendant asserted that his receipt of money from the CI on January 13 and 20 was merely the continuation or conclusion of the marijuana sales that occurred on January 9 and 16, respectively. Thus, the Defendant argued that to support a conviction for money laundering, to the extent the payments on January 13 and 20 constituted financial transactions, there must have been an additional transaction thereafter, in which he "turned around and did another financial transaction with that money." The Defendant's double jeopardy argument built off his sufficiency argument and asserted that, through his money laundering convictions, he was being punished twice for each of the two single acts of selling marijuana to the CI. Lastly, the Defendant argued that the money laundering statute was unconstitutionally vague in that it did not define "carrying on" with respect to the element of having an "intent to promote the carrying on of a specified unlawful activity." The Defendant contended that, absent a definition, the statute failed to alert individuals as to what constitutes a prohibited act.

The trial court rejected the Defendant's arguments. The trial court found that the exchanges of money on January 13 and 20 were financial transactions under the money laundering statute and the statute does not require a subsequent transaction. All the statute required, according to the trial court, was that the Defendant conduct the transaction "with the intent to further unlawful activity." The trial court also concluded that the convictions did not violate double jeopardy protections, noting not just that the convictions passed muster under Blockburger v. United States, 284 U.S. 299 (1932), but also that the money

6

laundering statute itself specifically provided that money laundering shall be "separately punished" from any related specified unlawful activity. Tenn. Code Ann. § 39-14-904 (2006). Lastly, the trial court concluded that the money laundering statute was not rendered unconstitutionally vague by the lack of a statutory definition of the phrase "carrying on." The trial court found that "[i]n the context of the sentence, 'carrying on' clearly means the continuation or furtherance of an unlawful activity. Citizens are given proper notice under the statute that using illegal proceeds to promote further criminal activity violates [section] 39-14-903."

The Court of Criminal Appeals affirmed the trial court's judgments. State v. Robert Jason Allison, No. M2017-02367-CCA-R3-CD, 2019 WL 4072139 (Tenn. Crim. App. Aug. 29, 2019), perm. app. granted, (Tenn. Jan. 15, 2020). The intermediate appellate court concluded that "the act of accepting payment for the fronted drugs constituted a 'financial transaction' separate and distinct from the original transactions on January 9th and 16th" and that "a reasonable jury could infer that Defendant was in the business of selling marijuana and that he intended to use the money paid to him for the fronted drugs to buy more drugs to deliver or sell." Id. at *6. The court further concluded that double jeopardy principles did not preclude the Defendant's convictions for money laundering, pointing to the language in the money laundering statute that specifically authorizes separate punishment. Id. at *7 (citing Tenn. Code Ann. § 39-14-904). Lastly, the court concluded that the money laundering statute was not vague and agreed with the trial court's construction of "carrying on" as meaning "the continuation or furtherance of an unlawful activity." Id. at *8.

We granted the Defendant permission to appeal to examine the propriety of his convictions for "promotional" money laundering based on his receipt of payment for marijuana he fronted to the CI.

## II. ANALYSIS

The criminal offense of money laundering is perhaps most commonly understood to refer, generally speaking, to financial transactions that are aimed at concealing the nature or source of funds that resulted from criminal activity. Indeed, Tennessee law prohibits this very conduct. See, e.g., Tenn. Code Ann. § 39-14-903(a)(1) (prohibiting the use of criminally derived proceeds to conduct a financial transaction with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds). However, there is another form of money laundering that is less well known but no less illegal. This form of money laundering criminalizes certain acts involving criminally derived proceeds that, rather than being done with the intent to conceal aspects

7

of the criminally derived proceeds, are undertaken with the intent to promote the carrying on of unlawful activity. See Tenn. Code Ann. § 39-14-903(b)(1), (c)(1). See generally United States v. Reed, 264 F.3d 640, 650 (6th Cir. 2001) (identifying "two different kinds of money laundering: the 'concealment' of the underlying illegal activity, which is the more traditional form of laundering[,] . . . and the 'promotion' of illegal activity"); United States v. Skinner, 946 F.2d 176, 177-78 (2d Cir. 1991) (noting that the less traditional form of money laundering was intended "to reach conduct that went beyond the concealment of proceeds of criminal activity" and "to make unlawful a broad array of transactions designed to facilitate" criminal activity). This latter conduct is often referred to in caselaw as "promotional" money laundering. See, e.g., United States v. Warshak, 631 F.3d 266, 317 (6th Cir. 2010) (identifying the elements of the offense of promotional money laundering).

In this appeal, we review the Defendant's two convictions for promotional money laundering that resulted from his knowing acceptance of two cash payments for fronted drugs, each represented to him to be the proceeds of illegal drug sales. In this Court, the Defendant argues:

(1) the evidence was legally insufficient to support his money laundering convictions;

(2) his money laundering convictions run afoul of double jeopardy protections; and

(3) the money laundering statute is unconstitutionally vague in its use of and failure to define "carrying on."

We address the Defendant's arguments in turn, carefully examining the money laundering statute and the proof adduced in this particular case.

## A.     Sufficiency of the Evidence

Our standard of review regarding a challenge to the sufficiency of the evidence recognizes that a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. State v. Gentry, 538 S.W.3d 413, 420 (Tenn. 2017) (citing State v. Wagner, 382 S.W.3d 289, 297 (Tenn. 2012)). Accordingly, the defendant bears the burden on appeal of demonstrating why the evidence was legally insufficient to support the verdict. State v. Jones, 589 S.W.3d 747, 760 (Tenn. 2019). The familiar inquiry is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."

8

Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings . . . of guilt beyond a reasonable doubt.").

On appeal, we do not weigh the evidence anew. Instead, a jury's guilty verdict operates to accredit the testimony of the witnesses for the State and resolves all evidentiary conflicts in favor of the State. Jones, 589 S.W.3d at 760. Thus, we afford the State the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn from the evidence. State v. Williams, 558 S.W.3d 633, 638 (Tenn. 2018). "This standard of review is identical whether the conviction is predicated on direct or circumstantial evidence, or a combination of both." Id. (citing State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011)).

We begin our inquiry by examining the Money Laundering Act of 1996 ("the Act"), Tennessee Code Annotated sections 39-14-901 to -909, to identify the elements of the offense so that we may determine whether any rational trier of fact could have found the elements beyond a reasonable doubt based on the evidence presented at trial. As pertinent to this case, the offense of money laundering is defined as follows:

> It is an offense to knowingly conduct, conspire to conduct, or attempt to conduct a financial transaction *or make other disposition* involving property or proceeds represented . . . by another at the direction of a law enforcement officer, to be the property or proceeds derived from a specified unlawful activity with the intent to conceal or disguise the nature, location, source, ownership or control of the criminally derived proceeds *or* with the intent to promote the carrying on of a specified unlawful activity.

Tenn. Code Ann. § 39-14-903(c)(1) (emphasis added).

"Conduct" means, among other terms, "initiating, concluding, participating, negotiating or aiding and abetting in such initiating, concluding, participating, or negotiating." Tenn. Code Ann. § 39-14-902(6) (2006).[11] "Financial transaction" is defined broadly to mean, among other terms, "a purchase, sale, loan, pledge, contract, gift, [or] payment." Tenn. Code Ann. § 39-14-902(2). "Specified unlawful activity" means, with certain inapplicable exceptions, "any act, including any preparatory or completed offense, committed for financial gain that is punishable as a felony under the laws of this state." Tenn. Code Ann. § 39-14-902(5)(A).

---

[11] We refer to these terms as they were defined at the time of the Defendant's offenses.

9

The Act was adopted as a counterpart to the federal money laundering statute.[12] Deb. on H.B. 47, 99th Gen. Assemb. (Tenn. Apr. 25, 1996) (statement of Rep. Herron); Hearing on H.B. 47 Before the H. Fin., Ways & Means Comm., 99th Gen. Assemb. (Tenn. Apr. 16, 1996) (statement of Rep. Herron); Hearing on H.B. 47 Before the H. Judiciary Comm., 99th Gen. Assemb. (Tenn. Jan. 31, 1996) (statement of Rep. Herron). One of the central concerns of the federal statute was money laundering associated with drug trafficking. See, e.g., Reed, 264 F.3d at 650. Similarly, with respect to Tennessee's statute, the General Assembly not only indicated generally that it was intended to parallel the federal statute, but also specifically referenced that it was designed with criminal drug activity in mind. Deb. on H.B. 47, 99th Gen. Assemb. (Tenn. Apr. 25, 1996) (statement of Rep. Herron); Hearing on S.B. 379 Before the S. Fin., Ways & Means Comm., 99th Gen. Assemb. (Tenn. Apr. 23, 1996) (testimony of Gen. McCutchen); Hearing on H.B. 47 Before the H. Fin., Ways & Means Comm., 99th Gen. Assemb. (Tenn. Apr. 16, 1996) (statement of Rep. Herron). In light of this history, we can look to federal decisions for instructive reasoning even though the language of Tennessee's statute differs somewhat from that of the federal statute. Compare Tenn. Code Ann. §§ 39-14-901 to -909, with 18 U.S.C. §§ 1956-57.

In this Court, the Defendant does not contest that he acted knowingly. Nor does the Defendant contest that the January 13 and 20 cash payments he received from the CI were represented to him to be the proceeds of specified unlawful activity, in this case the sale of marijuana. Instead, the Defendant contends that he did not conduct a financial transaction separate and apart from the exchange of drugs for money. The Defendant argues that there must be another financial transaction—beyond what occurred on January 13 and 20 (which he asserts was merely the completion of what began on January 9 and 16, respectively)—to support a conviction for money laundering. Stated another way, the Defendant argues that without proof he made a disposition of the proceeds he accepted from the CI (with the intent to promote the carrying on of the sale of marijuana), there was insufficient evidence to support his money laundering convictions. [13]

---

[12] The federal statute is commonly referred to as the Money Laundering Control Act of 1986 and is codified at 18 U.S.C. sections 1956-57.

[13] As part of his sufficiency argument, the Defendant also contends that the indictment failed to allege the essential element that the financial transaction be conducted with the intent to conceal or disguise the nature of the criminal proceeds. In the same vein, the Defendant faults the jury instructions for not including similar language when setting forth the elements of the offense of money laundering. As we explained earlier in our analysis, the Act reaches financial transactions conducted with the intent to promote the carrying on of specified unlawful activity as well as those conducted with the intent to conceal or

The question raised by the Defendant's argument has been the subject of disagreement among the federal courts. In United States v. Dovalina, 262 F.3d 472, 475-76 (5th Cir. 2001), the court evaluated the sufficiency of the evidence supporting the defendant's conviction for promotional money laundering.[14] The defendant was involved in a marijuana distribution scheme in which he supplied marijuana to another individual, who would later deliver a cash payment to the defendant. Id. at 475. The government argued "that the consignment arrangement between [the defendant and the other individual] is by itself sufficient to establish each element of money laundering." Id.

The court, however, noted that the government did not present evidence that the defendant used the proceeds to buy more marijuana and stated "[a] promotion[al] money laundering offense cannot be established merely by evidence of a single buyer's repeated payments to a distributor." Id. at 476. The court further stated that the government "was required to prove that [the defendant] used at least part of the proceeds *in a subsequent financial transaction* with the intent to promote unlawful activity." Id. (emphasis added). The court ultimately found sufficient evidence, in spite of the lack of proof that the defendant used the proceeds to purchase additional marijuana, by virtue of a host of financial transactions—including payments for airline tickets, cellular phone bills, rental cars, lodging, and shipping expenses—made using cash proceeds from the sale of marijuana and with the intent to promote drug trafficking activity. Id.

Similarly, in United States v. Puig-Infante, 19 F.3d 929, 937-39 (5th Cir. 1994), the court addressed the sufficiency of the evidence supporting convictions for aiding and abetting promotional money laundering in the context of a marijuana distribution scheme involving multiple defendants. With respect to one defendant, the evidence revealed that

---

disguise certain aspects of criminally derived proceeds. See Tenn. Code Ann. § 39-14-903(c)(1). The plain language of the statute, however, is disjunctive. An offense therefore requires only one of those elements, not both. In this case, the State never asserted that the Defendant conducted the January 13 or 20 transactions with an intent to conceal or disguise proceeds. Thus, there was no defect in either the indictment or the jury instructions related to the absence of this language. See United States v. Jackson, 935 F.2d 832, 842 (7th Cir. 1991) (recognizing that an indictment and jury instructions need not state both concealment and promotion, because the statute requires proof only of one or the other). Accord United States v. Baker, 63 F.3d 1478, 1495 (9th Cir. 1995); United States v. Paramo, 998 F.2d 1212, 1218 n.3 (3d Cir. 1993).

[14] The court did so as part of a review of the effectiveness of counsel, analyzing whether there was a reasonable probability that, but for counsel's alleged deficient briefing on direct appeal, the defendant "would have established that there was insufficient evidence to support his money laundering conviction." Dovalina, 262 F.3d at 475.

11

she was involved in a drug run from Texas to Florida, picking up a load of marijuana along the way, which was ultimately delivered to two buyers. The buyers paid $47,000 for the marijuana, and the defendant returned to Texas with the proceeds. Id. at 937-38. "There was no evidence of what, if anything, happened to the money thereafter." Id. at 938.

The court noted that the $47,000 payment became proceeds of unlawful activity only upon completion of the sale of marijuana. Id. at 939. The question before the court was whether the defendant's subsequent mere transportation of those proceeds from Florida to Texas constituted a "financial transaction" within the meaning of the federal money laundering statute. In determining that the defendant's mere transportation of the proceeds of unlawful activity was not a financial transaction, the court looked to the definition of "transaction" in the statute.[15] "Transaction" meant, among other terms, "a purchase, sale, loan, pledge, gift, transfer, delivery, *or other disposition*." Id. at 938 (quoting 18 U.S.C. § 1956(c)(3)) (emphasis added). The court stated:

> Although it is clear that the transportation of money by car is not a "purchase, sale, loan, pledge, or gift," whether such transportation is a "transfer" or "delivery" is less clear. However, the statute makes plain that for something . . . to be a transaction, it must be a "disposition." "Disposition" most commonly means "a placing elsewhere, a giving over to the care or possession of another."

Id. (quoting Disposition, Webster's 3d New Int'l Dictionary (1961)). Because the record contained no proof that the defendant "effected a disposition of those proceeds," the court found the evidence supporting the money laundering conviction insufficient. Id. at 938-39.

Additionally, in United States v. Heaps, 39 F.3d 479, 484-86 (4th Cir. 1994), abrogated on other grounds by United States v. Cabrales, 524 U.S. 1, 6 (1998), the court addressed the sufficiency of the evidence of promotional money laundering with respect to a defendant who was convicted based on his receipt of payment for drugs he had fronted

---

[15] The federal statute differs somewhat from the Act. Generally speaking, the Act specifies that it is an offense to conduct a financial transaction *or make other disposition* involving criminally derived proceeds. Tenn. Code Ann. § 39-14-903(a)(1), (c)(1) (emphasis added). Financial transaction is defined to include a "purchase, sale, loan, pledge, contract, gift, [or] payment." Tenn. Code Ann. § 39-14-902(2). On the other hand, the federal statute specifies that it is an offense to conduct a financial transaction involving criminally derived proceeds, 18 U.S.C. § 1956(a)(1), (a)(3), but it defines "transaction" to include a "purchase, sale, loan, pledge, gift, transfer, delivery *or other disposition*." 18 U.S.C. § 1956(c)(3) (emphasis added).

12

to others. The proof showed that the defendant supplied the illegal drug ecstasy to two individuals. The individuals paid for a portion of the drugs, but the defendant also fronted additional drugs with the expectation that the individuals would sell the drugs and pay the outstanding balance owed from the proceeds of the sales. Id. at 481. Pursuant to this arrangement and at the defendant's request, one of the individuals wired $2,000 in money orders to the defendant's girlfriend. Id. at 481-82. The girlfriend cashed the money orders and "brought the $2,000 to the apartment that she and the defendant shared, and put the cash in a money box." Id. at 482. The defendant was convicted of both promotional money laundering and concealment money laundering based on the $2,000 wire transfers. Id. at 480-81.

A majority of the court reversed, concluding that there was insufficient evidence to support the money laundering convictions. With regard to the promotional money laundering convictions, much of the court's discussion focused on whether the proof established "that the transaction alleged was intended to promote the carrying on of specified unlawful activity." Id. at 483-86. However, the court also commented that "the defendant's only crime was the consummation of the sale of ecstasy," id. at 485, and that "the payment was merely to satisfy a debt of a completed and, as far as the record shows, the final transaction," id. at 484. The court found "[t]here was no evidence that the money acquired through the payment was *itself* used to promote an unlawful activity." Id. at 486 (emphasis added). As a result, the court disagreed with the suggestion that "the mere receipt of a money transfer and the subsequent placement of cash in a box can, of itself, constitute money laundering," id. at 486, and cautioned that "[w]ere the payment for drugs itself held to be a transaction that promoted the unlawful activity of that same transaction virtually *every* sale of drugs would be an automatic money laundering violation as soon as money changed hands," id. at 485.

The dissenting judge in Heaps had a different view of the proof. The dissent stated that "[w]hile there is no direct evidence that the $2,000 was actually 'plowed back' into the illegal drug activity, the circumstantial evidence clearly supports the conclusion that the $2,000 supported an ongoing drug conspiracy through a 'fronting' scheme by which [the defendant] distributed drugs to [the two individuals]." Id. at 488-89 (Niemeyer, J., concurring and dissenting). Of interest, the dissent agreed with the majority "that the payment *constituting a drug violation* cannot serve as the basis for money laundering." Id. at 488. However, the dissent continued, "that does not mean that a financial transaction after completion of the illegal drug activity, even if closely connected, cannot constitute money laundering." Id. The dissent found such a financial transaction in the form of the girlfriend's cashing of the money orders that the two individuals had wired. Id. at 488 n.*.

13

On the other hand, other courts, with varying degrees of analysis, have effectively concluded that the receipt of payment in the form of criminally derived proceeds, so long as it is accompanied by proof of an intent to promote the carrying on of specified unlawful activity, is sufficient to support a conviction for promotional money laundering. For instance, in United States v. Barragan, 263 F.3d 919, 921-22 (9th Cir. 2001), the defendant was convicted of promotional money laundering for his participation in a drug distribution scheme. The proof showed that the defendant supplied drugs to others, and he would be paid, sometimes by wire transfer, after the others sold the drugs. Id. at 922. With respect to money laundering, the defendant was indicted for and convicted of "'initiating or concluding' the wiring of drug proceeds" on certain dates. Id. at 923. On appeal, although the discussion focused upon the sufficiency of the evidence showing the defendant's intent to promote the carrying on of the unlawful distribution of controlled substances, the court commented that "the Government did not bear the additional burden of proving that [the defendant] actually reinvested the proceeds in the illicit enterprise." Id. at 924.

Additionally, in United States v. Skinner, 946 F.2d 176, 177 (2d Cir. 1991), defendants Skinner and Blodgett were convicted of, among other offenses, promotional money laundering. The proof showed that on several occasions, defendant Blodgett "sent cocaine from Alaska to [defendant] Skinner in Vermont," and "Skinner would then sell the cocaine to purchasers in Vermont." Id. at 177. "To pay Blodgett for the cocaine, Skinner used the proceeds of her sales to purchase U.S. Postal Service money orders totaling $3,320, which she then sent to Blodgett in Alaska." Id.

The defendants, relying on the assertion that they did not conceal the source of the proceeds generated from illegal activity, argued that "Congress did not intend . . . to convert simple payment for illegal drugs into an independent offense." Id. The court rejected the argument, stating:

> Although appellants' conduct seems to differ from that which we traditionally associate with the term "money laundering," the language Congress used in 18 U.S.C. [section] 1956(a)(1)(A)(i) shows that it sought to reach conduct that went beyond the concealment of proceeds of criminal activity. Indeed, the words of this provision of the statute, in conjunction with the definitions provided in 18 U.S.C. [section] 1956(c) (1988), demonstrate that Congress intended to make unlawful a broad array of transactions designed to facilitate numerous federal crimes, including the sale of cocaine.

14

Id. at 177-78 (footnote omitted).  The court, "applying the language of [the money laundering] provision to appellants' activities," concluded that the defendants—including defendant Blodgett, who simply received payments for drugs he fronted to defendant Skinner—were properly convicted of promotional money laundering.  Id. at 178.

We are mindful of caselaw indicating that "Congress appears to have intended the money laundering statute to be a separate crime distinct from the underlying offense that generated the money to be laundered" and that "Congress aimed the crime of money laundering at conduct that follows in time the underlying crime rather than to afford an alternative means of punishing the prior 'specified unlawful activity.'"  Heaps, 39 F.3d at 486 (quoting United States v. Edgmon, 952 F.2d 1206, 1213-14 (10th Cir. 1991)).  Given this legislative insight, the majority in Heaps stated that "[t]he statute should not be interpreted to make any drug transaction a money laundering crime."  Id.  Likewise, in this case, we believe the General Assembly did not intend for the Act to render any drug transaction a promotional money laundering offense.

We are persuaded that the Defendant's mere receipt of payment for marijuana he fronted to the CI, standing alone, would not support a conviction for promotional money laundering, even assuming sufficient evidence to establish that the Defendant accepted payment with intent to promote the carrying on of specified unlawful activity.  See Dovalina, 262 F.3d at 476.  We observe that the Act, in pertinent part, makes it an offense for a person to initiate, conclude, participate in, or negotiate a "payment" (assuming the other elements of the offense are also met).  Tenn. Code Ann. §§ 39-14-902(2), (6); 39-14-903(c)(1).  We question whether the Defendant's receipt of payment from the CI as compensation for the fronted drugs falls within the ambit of this statutory language.

Furthermore, the Act does not use "conduct, conspire to conduct, or attempt to conduct a financial transaction" in isolation.  Rather, the Act makes it an offense to conduct a financial transaction "or make *other disposition*" involving property or proceeds represented to be criminally derived.[16]  Tenn. Code Ann. § 39-14-903(c)(1) (emphasis added).  In our view, the General Assembly's use of this language supports our conclusion that, in the context of the offense of promotional money laundering, the Defendant's mere receipt of payment for fronted drugs, standing alone, is not sufficient to establish the

---

[16] The Act does not define "disposition."  The common understanding of "disposition," while having varying meanings, includes "a placing elsewhere, a giving over to the care or possession of another, or a relinquishing," or "the transfer of property from one to another (as by gift, barter, or sale . . .) or the scheme or arrangement by which such transfer is effected."  Disposition, Webster's 3d New Int'l Dictionary (1986).

15

element of conducting a financial transaction or making other disposition involving proceeds represented to the Defendant to have been derived from the sale of marijuana.

With these principles in mind, we turn to examine the entirety of the evidence supporting that the Defendant conducted a financial transaction or made other disposition involving proceeds represented to have been derived from the sale of marijuana. On January 13, the Defendant received $3,000 in cash from the CI. Four days earlier on January 9, the Defendant had delivered marijuana to the CI and offered tips on how best to market and sell it. The Defendant does not contest that the cash payment on January 13 consisted of funds represented to the Defendant to have been derived from the sale of marijuana.

On January 13, when the Defendant received cash payment from the CI, he stated that he was "tryin' to get [his] money together" because he needed to "try to get somethin' else." During the discussion, the Defendant had a telephone conversation with his supplier—the "dude right there with the scrill." After that conversation, the Defendant informed the CI that he believed he would have more marijuana the following night.

The proof further showed that just three days later on January 16, the Defendant delivered marijuana to the CI and again offered tips on how best to sell it. The Defendant confirmed that he had received the marijuana in question the previous night and prepared it for distribution, complaining that it "took forever to break 'em up." The Defendant also confirmed on January 16 that he had already paid his supplier for this marijuana. Thus, he expressed to the CI that he was not in a rush to be paid for fronted drugs and would accept payment "whenever [the CI was] ready."

From this proof, we conclude a rational juror could infer that the cash received by the Defendant on January 13, in fact, had been used by the Defendant to obtain the marijuana he delivered to the CI on January 16. Of note, when the Defendant was arrested on January 21, none of the $3,000 in currency provided by the CI to the Defendant on January 13 was found in the Defendant's possession. In our view, these facts reflect the "paradigmatic example" of promotional money laundering—that of "a drug dealer using the proceeds of a drug transaction to purchase additional drugs and consummate future sales." Warshak, 631 F.3d at 317.

We note that the State offered specific and detailed evidence—much of it the Defendant's own words—about the payment that occurred on January 13 as well as the broader circumstances surrounding the payment. The evidence revealed that this occasion was not a simple drug deal. Rather, a rational juror could reasonably infer that the

16

Defendant functioned as a middleman in a drug trafficking scheme, obtaining drugs from a supplier, distributing those drugs to sellers, purchasing additional drugs, and moving money back and forth along the chain. See United States v. Torres, 53 F.3d 1129, 1137 n.6 (10th Cir. 1995) (finding sufficient evidence of promotional money laundering as to defendant who obtained drugs from suppliers, sold the drugs to others for eventual re-sale to customers, received payment, and "would use the proceeds . . . to buy more [drugs] that would later be resold"). Accordingly, with respect to the first money laundering conviction (count five of the indictment), we conclude there was sufficient evidence that the Defendant conducted a financial transaction or made other disposition involving proceeds represented to have been derived from the sale of marijuana.

Of course, the proof also must be sufficient to establish the final element of the offense of promotional money laundering—that the Defendant acted with intent to promote the carrying on of the sale of marijuana. See Tenn. Code Ann. § 39-14-903(c)(1). We observe that a defendant's mental state is rarely subject to proof by direct evidence. Rather, the jury may infer the defendant's intent from surrounding facts and circumstances. State v. Brown, 311 S.W.3d 422, 432 (Tenn. 2010); see also State v. Inlow, 52 S.W.3d 101, 105 (Tenn. Crim. App. 2000) ("Intent, which can seldom be proven by direct evidence, may be deduced or inferred by the trier of fact . . . from all the circumstances of the case in evidence."); State v. Holland, 860 S.W.2d 53, 59 (Tenn. Crim. App. 1993) ("One's actions are circumstantial evidence of his intent.").

As to the Defendant's first money laundering offense, we believe the record is replete with evidence establishing the requisite intent to promote the carrying on of the sale of marijuana. The Defendant, who already had delivered marijuana to the CI on January 9—while offering tips on how best to market and sell the product—specifically commented when he received payment from the CI on January 13 that he was "tryin' to get [his] money together" so that he could "try to get somethin' else." The Defendant then gave the CI a timeline of when he would have more marijuana. True to his word, the Defendant had more marijuana three days later on January 16. He provided the CI multiple pounds of marijuana, again offering her tips on how to effectively sell the drugs, and told her he would accept payment for the fronted drugs "whenever [the CI was] ready." Considering all of these facts, we conclude the evidence supports a reasonable and legitimate inference that, for purposes of his first money laundering offense, the Defendant intended to promote the carrying on of the sale of marijuana.

We acknowledge that caselaw has identified areas of concern with respect to the element of intent to promote the carrying on of specified unlawful activity. For instance, courts have been loath in some cases to find sufficient evidence of intent to promote the

17

carrying on of specified unlawful activity when the proof affirmatively shows that a defendant's financial transaction involving criminally derived proceeds entailed lawful or innocuous expenditures. See, e.g., United States v. Jackson, 935 F.2d 832, 841-42 (7th Cir. 1991) (finding sufficient evidence of intent with respect to purchase of beepers connected to the defendant's drug distribution scheme, but finding insufficient evidence of intent with respect to payments for innocuous expenses); United States v. Olaniyi-Oke, 199 F.3d 767, 770-71 (5th Cir. 1999) (finding insufficient evidence of intent to promote the carrying on of mail fraud with respect to financial transaction of purchasing a computer with criminally derived funds when there was no proof linking the purchase to the fraudulent scheme); Torres, 53 F.3d at 1138-39 (finding insufficient evidence of intent with respect to financial transaction of purchasing a car with proceeds from a drug distribution scheme when there was no proof linking the purchase to the drug scheme).

Just as a defendant's disposition of proceeds toward unlawful activity is a circumstance that might bear on the question of the defendant's intent, a defendant's disposition of proceeds toward innocuous expenses also might bear on the question of the defendant's intent. In this case, however, we are not presented with such facts. The record before us certainly does not show affirmatively that the Defendant spent the funds he received from the CI on innocuous expenses. In fact, the proof supports an inference that the Defendant spent the funds he received from the CI on January 13 to purchase marijuana that he delivered to the CI on January 16.

Another area of concern with respect to the element of intent to promote the carrying on of specified unlawful activity is whether the court must examine the defendant's intent with an eye toward ongoing or future activity or whether the court properly may measure the defendant's intent by reference solely to antecedent criminal conduct. In other words, there is an open question as to whether, for purposes of promotional money laundering, a defendant can intend to "promote an already completed unlawful activity." United States v. Paramo, 998 F.2d 1212, 1218 (3d Cir. 1993). The question has divided federal courts. Compare Paramo, 998 F.2d at 1218 (holding that "a defendant can engage in financial transactions that promote not only ongoing or future unlawful activity, but also prior unlawful activity"), with Heaps, 39 F.3d at 484 (finding insufficient evidence of intent to promote the carrying on of unlawful activity when the purpose of the transaction "was merely to satisfy a debt of a completed [drug deal]" rather than "to encourage the defendant to supply more drugs"). However, we are not presented with the question here.

In this case, the evidence adduced at trial—particularly the Defendant's own statements—was sufficient to support an inference that the Defendant's "intent to promote" included ongoing or further unlawful activity separate and apart from his prior delivery of

18

marijuana on January 9. Thus, we are not presented with facts capable of showing an intent to promote only antecedent unlawful activity. Cf. United States v. Reed, 167 F.3d 984, 992-93 (6th Cir. 1999) (noting split of authority but concluding that the evidence was sufficient for the jury to conclude that defendant "acted with the intent to facilitate the continuation of drug trafficking").

Based on a careful review of the proof in this case, we conclude that the evidence was legally sufficient to support the Defendant's conviction for promotional money laundering under count five of the indictment. The proof showed that the Defendant knowingly conducted a financial transaction or made other disposition within the meaning of the Act, that the transaction or other disposition involved proceeds represented to him to have been derived from the sale of multiple pounds of marijuana, and that he did so with the intent to promote the carrying on of the sale of multiple pounds of marijuana.

Having concluded that the evidence was sufficient to support the Defendant's first money laundering offense (count five), we now turn to examine the evidence supporting the second money laundering offense (count six). We already have set forth the background facts about the circumstances leading up to January 20. On January 20, the Defendant again received cash payment from the CI of funds represented to have been derived from the sale of marijuana. At that time, the Defendant was in possession of a sample of "new scrill" that had "just come off the truck." There was no proof that the Defendant already had paid for the "new scrill."

The Defendant gave the CI a small amount of the sample—enough for a "joint"— and mentioned coming to see her later to confirm whether she wanted to purchase some of this new marijuana at a price of $850 per pound. The Defendant stated that he would be obtaining "fifty" of the new marijuana, but he also told the CI that he knew "[they would] go quick." The Defendant further stated that his supplier was "cutting" the product out of what it was transported in at that time. Thus, the jury reasonably could infer that although the Defendant was in possession of the sample of the new marijuana, he had not yet acquired the "fifty." Additionally, the jury reasonably could infer the Defendant's comments that the "fifty" would "go quick" to be a reference to plans to sell the marijuana.

The following day, January 21, when law enforcement officers arrested the Defendant, he was in possession of fourteen bricks of marijuana, weighing approximately forty-five pounds. The CI had paid the Defendant $3,000 on January 20. Of that amount, $2,480 was discovered in the Defendant's possession when he was arrested on January 21. However, the Defendant stated that he had obtained the marijuana in his possession on

January 21 "on credit," meaning that he had been fronted the drugs and still needed to pay his supplier.

To support the second money laundering offense, the Act requires proof that the Defendant conducted a financial transaction or made other disposition involving proceeds represented to him to have been derived from specified unlawful activity, in this case the sale of marijuana. Those proceeds, with respect to this count of money laundering, were comprised of the $3,000 the Defendant received from the CI on January 20. The proof showed that the Defendant was still in possession of $2,480 of those funds when he was arrested on January 21. The proof does not reveal what happened to the remaining $520, but it does demonstrate that the Defendant had not used it to pay for the marijuana discovered on January 21. Thus, the record reflects only that the Defendant received payment on January 20 for drugs he had fronted to the CI, and he was still in possession of the majority of those funds when he was arrested the next day. Based on these circumstances, even affording the State the strongest legitimate view of the evidence, we conclude that the evidence was not legally sufficient to establish that the Defendant conducted a financial transaction or made other disposition involving the January 20 proceeds. Therefore, we reverse his conviction for promotional money laundering under count six of the indictment.

## B.    Double Jeopardy

Based upon the contention that his acceptance of cash payments on January 13 and 20 was "merely the continuation of the sale of marijuana that occurred on January 9th and 16th respectively," the Defendant claims that his convictions for money laundering operate to punish him twice for a single action, his sales of marijuana to the CI.[17] The Defendant maintains that with respect to each sale of marijuana to the CI, "there is only a single financial transaction, the exchange of money for marijuana," "the statutes encompass this single set of facts and transactions," and "both statutes are criminalizing a single course of conduct." The Defendant therefore argues that convicting him for money laundering on January 13 and 20 in addition to his drug offenses of January 9 and 16, respectively, violates the double jeopardy protections of the United States and Tennessee constitutions.

Whether multiple convictions violate double jeopardy protections is a mixed question of law and fact. We review the issue de novo without any presumption of

---

[17] In his argument, the Defendant refers to the sale of marijuana. We reiterate that the Defendant was charged with and convicted of the delivery of marijuana, not its sale. Compare Tenn. Code Ann. § 39-17-417(a)(2), with Tenn. Code Ann. § 39-17-417(a)(3).

correctness.  State v. Watkins, 362 S.W.3d 530, 539 (Tenn. 2012) (citing State v. Thompson, 285 S.W.3d 840, 846 (Tenn. 2009)).[18]

The United States Constitution provides that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  Similarly, the Tennessee Constitution provides "[t]hat no person shall, for the same offence, be twice put in jeopardy of life or limb."  Tenn. Const. art I, § 10.  We have interpreted the protections afforded by article I, section 10 as co-extensive with the protections afforded by the Fifth Amendment.  Watkins, 362 S.W.3d at 548.  Those protections include prohibitions against: "(1) a second prosecution following an acquittal; (2) a second prosecution following a conviction; and (3) multiple punishments for the same offense."  Id.  The Defendant's claim in this appeal implicates the third category.

We have observed that in single prosecutions, "multiple punishment" challenges ordinarily fall into one of two categories: unit-of-prosecution claims and multiple description claims.  Id. at 543.  Unit-of-prosecution claims arise when a defendant has been convicted of multiple violations of the same statute.  Multiple description claims arise when a defendant has been convicted of multiple criminal offenses under different statutes.  Id. at 543-44.  In this appeal, the Defendant presents a multiple description claim.

Analysis of whether multiple convictions under different statutes violate double jeopardy protections focuses on ascertaining legislative intent.  When the General Assembly has expressed a clear intent to permit multiple punishments, no further analysis is necessary, and the court should uphold multiple convictions against a double jeopardy challenge.  Likewise, when the General Assembly has expressed a clear intent to preclude multiple punishment, no further analysis is necessary, and the court should vacate improper multiple convictions.  When the General Assembly's intent is not clearly expressed, the court must apply the Blockburger test[19] to determine whether multiple convictions under different statutes punish the "same offense."  Id. at 556.

In this case, we need look no further than the language of the Act itself.  The Act provides: "A defendant charged with a violation of one (1) or more offenses within § 39-14-903 may also be jointly charged, tried and convicted in a single prosecution for committing any related specified unlawful activity, *which shall be separately punished*."

---

[18] This Court issued a thorough explanation of the proper analysis of double jeopardy claims in Watkins.  We only will summarize the principles pertinent to this case in our analysis here.

[19] See Blockburger, 284 U.S. at 304.

21

Tenn. Code Ann. § 39-14-904 (2006) (emphasis added). Given the facts adduced at trial, the Defendant's offenses for delivery of marijuana and money laundering share a logical connection. The Act, however, specifically directs that money laundering offenses shall be separately punished from any related specified unlawful activity. Accordingly, the General Assembly's intent to permit multiple punishments is clear. As a result, we conclude that there is no need to apply the Blockburger test.

Accordingly, we agree with the trial court and the Court of Criminal Appeals that the General Assembly intended to permit multiple punishment under these circumstances. Thus, the Defendant's conviction of both offenses—the January 9 delivery of marijuana and the January 13 promotional money laundering—does not violate double jeopardy protections.[20]

### C. Vagueness

The Defendant argues that Tennessee Code Annotated section 39-14-903 is "void for vagueness as applied in this case."[21] As previously stated, the Act proscribes knowingly conducting a financial transaction or making other disposition involving property or proceeds represented to be property or proceeds derived from a specified unlawful activity "with the intent to promote the carrying on of a specified unlawful activity." Tenn. Code Ann. § 39-14-903(c)(1). In arguing that the statute is unconstitutionally vague, the Defendant asserts that the undefined phrase "carrying on" in section 39-14-903 "fails to alert someone as to what constitutes a prohibited action under the statute." The Defendant does not offer a construction of the statutory language that excludes his conduct from its reach.

The trial court rejected the Defendant's challenge, finding that "[i]n the context of the sentence, 'carrying on' clearly means the continuation or furtherance of an unlawful activity." The Court of Criminal Appeals agreed with the trial court's construction. Allison, 2019 WL 4072139, at *8.

---

[20] Because we reversed the Defendant's money laundering conviction under count six of the indictment, our double jeopardy analysis refers only to the Defendant's conviction under count five.

[21] Although the Defendant cites the due process guarantees of the Fifth Amendment in support of his argument, we will analyze the issue under the due process guarantees of the Fourteenth Amendment to the United States Constitution and article I, section 8 of the Tennessee Constitution.

This issue involves constitutional and statutory interpretation. We conduct such review de novo, affording no presumption of correctness to the conclusion of the trial court. State v. Crank, 468 S.W.3d 15, 21 (Tenn. 2015).

Constitutional due process guarantees have long prohibited holding a person "criminally responsible for conduct which he could not reasonably understand to be proscribed." United States v. Harriss, 347 U.S. 612, 617 (1954). In other words, a criminal statute must "give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden by the statute." Harriss, 347 U.S. at 617. See also State v. Burkhart, 58 S.W.3d 694, 697 (Tenn. 2001) (citing Grayned v. City of Rockford, 408 U.S. 104, 108 (1972)). In more recent jurisprudence, we have recognized that the purpose of due process protections against vagueness in criminal statutes is both to ensure that our statutes provide fair warning as to the nature of forbidden conduct and to ensure that our criminal laws provide reasonably clear guidelines for law enforcement officials and courts so as to protect against arbitrary and discriminatory enforcement. Crank, 468 S.W.3d at 22-23; State v. Pickett, 211 S.W.3d 696, 702 (Tenn. 2007).

These requirements, however, do not demand that criminal statutes "meet the unattainable standard of 'absolute precision.'" Crank, 468 S.W.3d at 23 (quoting State v. McDonald, 534 S.W.2d 650, 651 (Tenn. 1976)). "Many statutes will have some inherent vagueness, for '[i]n most English words and phrases there lurk uncertainties.'" Rose v. Locke, 423 U.S. 48, 49-50 (1975) (quoting Robinson v. United States, 324 U.S. 282, 286 (1945)). Thus, the core of what due process requires "is that the law give sufficient warning that [individuals] may conduct themselves so as to avoid that which is forbidden." Id.

As we evaluate the Defendant's vagueness challenge to section 39-14-903, we begin with the well-established principle that an act of the General Assembly is presumed to be constitutional. See, e.g., Pickett, 211 S.W.3d at 700. Thus, we must "indulge every presumption and resolve every doubt in favor of the statute's constitutionality." Id. (quoting Gallaher v. Elam, 104 S.W.3d 455, 459 (Tenn. 2003)).

As the Defendant points out, the Act does not define the phrase "carrying on." We have observed that in evaluating a statute for vagueness, a court may consider the plain meaning of the statutory terms, the legislative history, and prior judicial interpretations of the statutory language. Crank, 468 S.W.3d at 23. Unfortunately, the legislative history sheds only marginal light on the issue. As we previously described, the General Assembly certainly was cognizant of problems associated with drug trafficking when it enacted the Act, and it sought to address those problems through the Act. Beyond that general point,

23

however, there is nothing in the legislative history as to the legislative intent behind "carrying on" in what became section 39-14-903.

Likewise, prior judicial interpretations of the Act do not substantially aid our search for the construction of the phrase, nor do they resolve the question of whether the Act is unconstitutionally vague as applied to the Defendant. The Court of Criminal Appeals previously rejected a vagueness challenge to the Act, but that case did not specifically address the phrase "carrying on." State v. Wong, No. M2003-00504-CCA-R3-CD, 2004 WL 1434384, at *13 (Tenn. Crim. App. Jun. 25, 2004). We also note that federal courts have rejected vagueness challenges to the federal money laundering statute, although none precisely directed at the "carrying on" language. United States v. Cavalier, 17 F.3d 90, 93 n.5 (5th Cir. 1994); Jackson, 935 F.2d at 838-39.

Tennessee law, however, does provide that the criminal code "shall be construed according to the fair import of its terms." Tenn. Code Ann. § 39-11-104 (2018). As a result, we have recognized that a court "must employ the natural and ordinary meaning of the words in the statute" when evaluating a vagueness challenge. Pickett, 211 S.W.3d at 705. Similarly, because due process "does not demand absolute precision in the drafting of criminal statutes," Burkhart, 58 S.W.3d at 697, "[t]he use of common experience as a glossary" is permitted "to meet the practical demands" of legitimate statutory imprecision. State v. Netto, 486 S.W.2d 725, 730 (Tenn. 1972) (quoting Sproles v. Binford, 286 U.S. 374, 393 (1932)).

In response to the Defendant's argument that "carrying on" fails to alert someone as to what constitutes a prohibited action under the statute, the trial court construed "the carrying on of a specified unlawful activity" according to its common experience to mean the continuation or furtherance of an unlawful activity. As a result, the trial court found that the Defendant had fair warning "that using illegal proceeds to promote further criminal activity violates § 39-14-903."

Dictionary definitions of the phrase "carry on" abound, and there are slight differences among them. The Oxford English Dictionary contains perhaps the most fulsome definition. Its definitions of "carry on" include "to maintain, keep up, prevent from stopping" as well as "to conduct, manage, work at prosecuting." Carry on, The Oxford Eng. Dictionary (2d ed. 1989). Other sources define "carry on" as "to conduct or manage," Carry on, Webster's 3d New Int'l Dictionary (1986); "to conduct, maintain, or engage in," Carry on, The Am. Heritage Coll. Dictionary (3d ed. 1993); or "to engage in or conduct," Carry on, Webster's New World Dictionary of the Am. Language (2d Coll. ed. 1976). For its part, the State suggests that the phrase is "commonly understood to mean

24

'to continue an activity' or to engage in an activity.'" See Carry on, New Oxford Am. Dictionary (3d ed. 2010). There are common themes throughout the definitions.

We conclude that the common understanding of the phrase plainly encompasses the Defendant's conduct in this case. As to his money laundering conviction under count five, the Defendant previously had delivered marijuana to the CI with an expectation that she would sell the product and pay him with proceeds from the sales. The Defendant later received cash payment with a stated intent to purchase more marijuana, which he would then sell to the CI for her to re-sell to customers. The Defendant then, in fact, did purchase more marijuana, a portion of which he delivered to the CI for her to re-sell. In our view, the Defendant's intent readily falls within the statutory proscription. We agree with the trial court that, under the common understanding of the phrase, the Defendant had fair warning "that using illegal proceeds to promote further criminal activity violates § 39-14-903." Accordingly, we hold that section 39-14-903 is not unconstitutionally vague as applied to the Defendant.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the Court of Criminal Appeals in part and reverse it in part. We hold that the evidence adduced at trial was legally sufficient to support the Defendant's conviction for promotional money laundering under count five of the indictment, but the evidence was insufficient with respect to count six. Therefore, we reverse and dismiss the Defendant's conviction for money laundering under count six. We further hold that the Defendant's convictions for both delivery of marijuana and money laundering do not violate double jeopardy protections and that the Act is not unconstitutionally vague by virtue of its use of and failure to define "carrying on."

Our review of the record has revealed a clerical error with respect to the judgments on counts one and two. The judgments identify the indicted offense as "Poss w/int MJ o/ ½ oz" and identify the conviction offense as "same."[22] The record, however, clearly demonstrates that the indicted and conviction offense for counts one and two was delivery of marijuana rather than possession with intent to deliver. Accordingly, we remand this matter to the trial court for entry of corrected judgments as to counts one and two. See Tenn. R. Crim. P. 36; Tenn. R. App. P. 36(a).

---

[22] The judgments identify the correct statutory section—Tenn. Code Ann. § 39-17-417—but this section encompasses both delivery of a controlled substance, Tenn. Code Ann. § 39-17-417(a)(2), and possession of a controlled substance with intent to manufacture, deliver, or sell, Tenn. Code Ann. § 39-17-417(a)(4).

Because the Defendant appears to be indigent, costs of this appeal are taxed to the State.

_____

JEFFREY S. BIVINS, CHIEF JUSTICE